**ANIMAL SCIENCE PRODUCTS, INC., et al., Plaintiffs,**

v.

**CHINA NATIONAL METALS & MINERALS IMPORT & EXPORT CORPORATION, et al., Defendants.**

Civ. No. 05–4376 (GEB).

United States District Court, D. New Jersey.

Dec. 30, 2008.

David S. Stone, Robert A. Magnanini, Esqs. (Boies, Schiller & Flexner LLP), and Richard E. Donovan, Esq. (Kelley Drye & Warren LLP), for Plaintiffs Ani-

mal Science Products, Inc. and Resco Products, Inc.

Leda Dunn Wettre, Donald A. Robinson, Esqs. (Robinson, Wettre & Miller LLC), Jonathan S. Caplan, Robert M. Heller, Nicholas L. Coch, Thomas H. Moreland, Timothy J. Helwick, Esqs. (Kramer Levin Naftalis & Frankel LLP), and Gregory Karl Mueller, Esq., for Defendants China National Metals & Minerals Import & Export Co., Minmetals Inc., China National Minerals Import & Export Co., Sinosteel Co., China Metallurgical Import & Export Co., Liaoning Jiayi Metals & Minerals Co. Ltd., Haicheng Houying Co. Ltd., and Haicheng Huayu Group Import & Export Co. Ltd.

## OPINION

BROWN, Chief Judge:

This matter comes before the Court upon Plaintiffs' motion for default judgment (Docket Entry No. 28, "Plaintiffs' Motion") and defendant Minmetals Inc.'s ("Minmetals") motion to dismiss Plaintiffs' complaint (Docket Entry No. 27, "Defendant's Motion"). For the reasons stated below, Plaintiffs' Motion will be denied. Defendant's Motion will be granted insofar that Plaintiffs' complaint will be dismissed without prejudice, and Plaintiffs will be granted leave to amend their complaint. All residual motions will be dismissed as moot.

## TABLE OF CONTENTS

I. Procedural Background ............................................. 847

II. Motion for Default Judgment ....................................... 848

III. Challenges to Subject Matter Jurisdiction ......................... 850

IV. Plaintiffs' Allegations ........................................... 851
 A. Assertions as to Trade and Commerce ............................ 851
 B. Anticompetitive Conduct ........................................ 852
 C. Additional Elaborations ........................................ 853

V. Industry–Related Data ............................................. 854

VI. Pertinent Legal Regime ........................................... 857
 A. The Sherman Act ................................................ 857
 1. "Per Se" and "Rule of Reason" Analyses ..................... 857
 2. Parallel Pricing ........................................... 859
 B. The Foreign Trade Antitrust Improvements Act ................... 859
 1. Legislative History ........................................ 859
 2. Methodology of the FTAIA Analysis .......................... 860
 3. Direct, Substantial, and Reasonably Foreseeable Effect ..... 862
 4. Additional Considerations .................................. 863
 a. Comity ................................................. 863
 b. "Mixed FTAIA" Scenario ................................. 864

VII. Discussion ....................................................... 866
 A. Presumption as to Lack of Sovereign Action .................... 866
 B. As Drafted, Plaintiffs' Complaint Is Barred by the FTAIA ...... 868
 1. Trade and Commerce ......................................... 869
 2. Plaintiffs Failed to Assert Facts Showing a Link Between Defendants' Alleged Illegal Actions and the United States Commerce ................................................... 870
 a. Cost-of-Production Arguments ........................... 871

 b. Currency- and Sale–Price–Based Arguments .....................873
 c. Economic Arguments .........................................875
 3. The Complaint Indicates Lack of Subject Matter Jurisdiction...........876
 C. As Drafted, Plaintiffs' Complaint Fails to State a Sherman Act Claim.....877
 D. Plaintiffs' Motion for Default Judgment Will Be Denied ...................880

VIII. Leave to Amend ...............................................................880
 A. Grant of Leave Is in the Interests of Justice ...........................880
 B. Future Litigation .............................................................881

IX. Conclusion ......................................................................882

## I. PROCEDURAL BACKGROUND

At issue here is the extraterritorial scope of the Sherman Antitrust Act and its application to this case. The putative Plaintiffs' class comprises certain United States consumers of magnesite products who allege that a number of Chinese entities and their trade association conspired to keep prices on certain magnesite products artificially inflated worldwide, including in the United States.

On September 7, 2005, Plaintiffs Animal Science Products, Inc. and Resco Products, Inc. ("Animal Science" and "Resco," collectively, "Plaintiffs") filed a civil complaint naming the following seventeen entities as Defendants in this matter: China National Metals & Minerals Import & Export Corporation; China National Minerals Import & Export Corporation; Sinosteel Corporation; China Metallurgical Import & Export Corporation; Liaoning Jiayi Metals & Minerals Co. Ltd.; Haicheng Houying Co. Ltd.; Haicheng Huayu Group Import & Export Co. Ltd.; Minmetals; Xiyang Group; Xiyang Imoprt & Export Ltd. Co.; Xiyang Refractory Materials Ltd. Co.; Xiyang Fireproof Material Co. Ltd.; Liaoning Foreign Trade General Co.; Liaoning Jinding Magnesite Group; Dalian Golden Sun Import & Export Co.; Haicheng Pailou Magnesite Ore Co. Ltd.; and Yingkou Huachen Co. Ltd. *See* Docket Entry No. 1.

On October 17, 2005, an order extending Minmetals' time to file a responsive pleading was issued by Judge Harold A. Ackerman; that time was re-extended by Judge Ackerman on November 7, 2005, and then re-extended once again by Magistrate Judge Mark Falk on December 15, 2005. *See* Docket Entries Nos. 3, 5 and 6. No responsive pleading followed and, on May 4, 2007, Magistrate Judge Esther Salas (to whom the case was reassigned from Judge Falk) issued another order granting Minmetals two extensions to file such a pleading.[1] *See* Docket Entries Nos. 18 and 25. On December 14, 2007, Minmetals filed Defendant's Motion. *See* Docket Entry No. 27. Plaintiffs' filed their opposition on January 14, 2008, *see* Docket Entry No. 33, and Minmetals filed their reply on February 12, 2008. *See* Docket Entry No. 38.

Meanwhile, during 2007, Plaintiffs filed numerous motions for entries of default, *see, e.g.,* Docket Entries Nos. 16, 19 (hence, causing the Clerk to enter corresponding defaults); Plaintiffs followed those applications by filing Plaintiffs' Motion on December 14, 2007. *See* Docket Entry No. 28. On February 5, 2008, certain Defendants filed their opposition to Plaintiffs' Motion, *see* Docket Entries Nos. 36 (supplemented by Docket Entry No. 41), together with Defendants motion to

---

1. The chain of time extensions was based on the parties' dispute as to the validity of Plaintiff's international service of process.

compel arbitration.[2] *See* Docket Entry No. 37. On February 25, 2008, Plaintiffs filed their reply to Defendants' opposition. *See* Docket Entry No. 42. Defendants' sur-reply was filed on March 6, 2008. *See* Docket Entry No. 48 (supplemented by Docket Entry No. 50). Since then, extensive briefing of the arbitration issue has taken place.

On September 15, 2008, the matter was reassigned to the undersigned. On October 6, 2008, this Court held oral arguments as to the pending motions.

## II. MOTION FOR DEFAULT JUDGMENT

■ Default is governed by Federal Rule of Civil Procedure 55. *See* Fed. R.Civ.P. 55. "Pursuant to Rule 55(a), a plaintiff can request the clerk's entry of default against a party 'against whom a judgment for affirmative relief is sought that has failed to plead or otherwise defend [and] that fact is made to appear by affidavit or otherwise.'" *Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds*, 250 F.R.D. 171, 177 (D.N.J.2008), (quoting Fed.R.Civ.P. 55(a)). "Thereafter, the plaintiff may seek the Court's entry of default judgment under either Rule 55(b)." *Doug Brady*, 250 F.R.D. at 177 (citing *Nationwide Mutual Ins. Co. v. Starlight Ballroom Dance Club, Inc.*, 175 Fed.Appx. 519, 521, n. 1 (3d Cir.2006)). "The district court has the discretion to enter default judgment, although entry of default judgments is disfavored as decisions on the merits are preferred." *Super 8 Motels, Inc. v. Kumar*, No. 06–5231, 2008 WL 878426, at *3, 2008 U.S. Dist. LEXIS 28066, at *7 (D.N.J. April 1, 2008) (citing

*Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir.1984)). In other words, district courts must remain mindful that, like dismissal with prejudice, default is a sanction of last resort, *see Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 867–68 (3d Cir.1984) ("We reiterate what we have said on numerous occasions: that dismissals with prejudice or defaults are drastic sanctions"), and district courts must resolve all doubt in favor of proceeding on the merits. *See Zawadski de Bueno v. Bueno Castro*, 822 F.2d 416, 420 (3d Cir.1987).

■ Moreover, "before imposing the extreme sanction of default, district courts must make explicit factual findings as to: (1) whether the party subject to default has a meritorious defense, (2) the prejudice suffered by the party seeking default, and (3) the culpability of the party subject to default." *Doug Brady*, 250 F.R.D. at *177 (quoting *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 74 (3d Cir.1987), stating "[W]e have further required the district court to make explicit findings concerning the factors it must consider in rendering judgment by default or dismissal, or in declining to reopen such judgment"). Hence, a litigant's failure to state a claim upon which relief may be granted, e.g., an assertion of a claim over which the court lacks jurisdiction, prevents the presiding court from entering a default judgment, *see Comcast Cable Communs. v. Dorris*, 2005 U.S. Dist. LEXIS 23156, at *5–6 (D.N.J. Feb. 8, 2005); *Abney v. Alameida*, 334 F.Supp.2d 1221 (S.D.Cal.2004); *see also Quirindongo Pacheco v. Rolon Morales*, 953 F.2d 15 (1st Cir.1992); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir.1981); *Danning v. Lavine*, 572

---

**2.** As of the date of entry of the Order accompanying this Opinion, Defendants Xiyang Group, Xiyang Import & Export Ltd. Co., Xiyang Refractory Materials Ltd. Co., Xiyang Fireproof Material Co. Ltd., Liaoning Foreign Trade General Co., Liaoning Jinding Magnesite Group, Dalian Golden Sun Import & Export Co. did not make appearances in this matter.

F.2d 1386, 1388 (9th Cir.1978); *Kelley v. Carr*, 567 F.Supp. 831, 840 (W.D.Mich. 1983); 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2688 at 447–48 (1983), since, under Rule 55(b)(2), the litigant is not entitled to a default judgment unless (s)he establishes that the essential elements of the pleaded claims are present and states factual allegations in support of these elements.[3] *See Comdyne I v. Corbin*, 908 F.2d 1142, 1149 (3d Cir.1990); *Fehlhaber v. Indian Trails, Inc.*, 425 F.2d 715, 717 (3d Cir.1970); *D.B. v. Bloom*, 896 F.Supp. 166, 170 n. 3 (D.N.J.1995).

■ Finally, if default is entered against some defendants in a multi-defendant case, the preferred practice is for the court to withhold granting default judgment until the action is resolved on its merits against non-defaulting defendants: if plaintiff loses on merits, the complaint should then be dismissed against both defaulting and non-defaulting defendants. *See Jefferson v. Briner, Inc.*, 461 F.Supp.2d 430 (E.D.Va. 2006) (relying on *Frow v. De La Vega*, 82 U.S. 552, 15 Wall. 552, 21 L.Ed. 60 (1872)); *see also Northland Ins. Co. v. Cailu Title Corp.*, 204 F.R.D. 327 (W.D.Mich.2000); *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London*, 378 F.Supp. 403 (S.D.N.Y.1974); *accord Thabault v. Chait*, 541 F.3d 512, 531 (3d Cir.2008).

■ It appears that the matter at hand presents this Court with the entire panoply of obstacles to default judgment, since it is a multi-defendant case where some Defendants defaulted but others did not, the validity of service of process is challenged by all Defendants, the sufficiency of Plaintiff's pleading is challenged by one of them, and the complaint is yet to pass muster for the purposes of this Court's *sua sponte* dismissal power. This Court, therefore, while taking due notice of Defendants' service-related challenges and the prudential considerations pertinent to the entry of default judgment against selected defendants in a multi-defendant suit, finds it prudent and in the interests of judicial economy (as well as in the interests of litigants, granted the current procedural posture of this matter) to limit this Court's review to the issues of subject matter jurisdiction and sufficiency of Plaintiffs' pleading: it is indeed axiomatic that, prior to entering default judgment, the Court must ensure that its has proper jurisdiction over the action, just as the Court must determine that Plaintiffs, at the very least, sufficiently stated their claim. *See Quirindongo Pacheco*, 953 F.2d 15; *Au Bon Pain Corp.*, 653 F.2d 61; *Danning*, 572 F.2d 1386; *Atlantic Recording Corp. v. Brennan*, 534 F.Supp.2d 278 (D.Conn.2008); *Calderon v. Burton*, 457 F.Supp.2d 480 (S.D.N.Y.2006); *Comcast Cable Communs.*, 2005 U.S. Dist. LEXIS 23156; *Abney*, 334 F.Supp.2d 1221; *Patray v. Northwest Publ.*, 931 F.Supp. 865 (S.D.Ga.1996); *Kelley*, 567 F.Supp. 831; *see also* 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2688 at 447–48 (1983).

---

**3.** In addition, entry of a default judgment is an inappropriate use of judicial discretion where there has been insufficient service. *See First American Bank, N.A. v. United Equity Corp.*, 89 F.R.D. 81 (D.D.C.1981); *see also Dahl v. Kanawha Inv. Holding Co.*, 161 F.R.D. 673, 685 (N.D.Iowa 1995) (where it appears that plaintiffs "have never properly served the defendants, . . . neither entry of default nor entry of default judgment would be proper"). Thus, if there is a challenge to the adequacy of service, the party who seeks default judgment and, allegedly, served the complaint bears "the burden of establishing its validity when a challenge to its effectiveness is made." *Adams v. American Bar Association*, 400 F.Supp. 219, 222 (E.D.Pa.1975).

## III. CHALLENGES TO SUBJECT MATTER JURISDICTION

■ The failure of a party to address the issue of subject matter jurisdiction neither waives nor disposes of the issue.[4] *See Three Keys Ltd. v. SR Util. Holding Co.*, 540 F.3d 220, 226 (3d Cir.2008) (citing *Bracken v. Matgouranis*, 296 F.3d 160, 162 (3d Cir.2002)) ("[The] Court has a continuing obligation to *sua sponte* raise the issue of subject matter jurisdiction if it is in question"); *Morel v. INS*, 144 F.3d 248, 251 n. 3 (3d Cir.1998) (quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982), as to the observation that "[a] federal court ... will raise lack of subject-matter jurisdiction on its own motion.")

■ Deficiencies as to the "subject matter jurisdiction may be either 'facial' or 'factual.'" *Turicentro, S.A. v. Am. Airlines, Inc.*, 303 F.3d 293, 300, n. 4 (2002). Assessing a factual deficiency, the court: (1) "must weigh the evidence relating to jurisdiction, with discretion to allow affidavits, documents, and even limited evidentiary hearings," *id.* (citing *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1260–61 (11th Cir.1997); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir.1990); *Oaxaca v. Roscoe*, 641 F.2d 386, 391 (5th Cir.1981)); and (2) "can look beyond the pleadings to decide factual matters relating to jurisdiction."[5] *Id.* (quoting *Cestonaro v. United States*, 211 F.3d 749, 752 (3d Cir.2000)).

In contrast, "[f]acial attacks contest the sufficiency of the pleadings, and the trial court must accept the complaint's allegations as true." *Id.* However, last year the Supreme Court elaborated on the requirements a pleading must meet to withstand a facial attack. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In *Twombly*, the Court explained that the pleading must provide "enough factual matter" to suggest that the alleged event took place. *See id.* at 1965. While the Supreme Court left it to the district courts to determine, on a case-by-case basis, how much factual matter is "enough," the Court unambiguously indicated that represented litigants cannot satisfy the pleading requirements by invoking the overly lenient regime of "pure notice" originated in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), a case decided half a century ago. In fact, the *Twombly* Court explicitly disavowed

---

4. Federal courts are courts of limited jurisdiction. Thus, a federal court shall presume lack of jurisdiction, and the party seeking to invoke the court's jurisdiction bears the burden of proving that subject matter jurisdiction exists. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). While the court is obligated to test subject matter jurisdiction *sua sponte*, Rule 12(b)(1) also authorizes a party to move to dismiss a claim for lack of subject matter jurisdiction. *See* Fed.R.Civ.P. 12(b)(1). A party challenging the court's jurisdiction under Rule 12(b)(1) may do so by raising either a facial attack or a factual attack. In contrast, a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests only the legal sufficiency of a claim.

5. The Court of Appeals for the Third Circuit clarified that, "in the Sherman Act context, jurisdictional facts are often closely intertwined with the merits of the claim," *Carpet Group Int'l v. Oriental Rug Importers Ass'n*, 227 F.3d 62, 73 (3d Cir.2000) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 892 (3d Cir.1977)), hence, requiring the party invoking the court's jurisdiction to produce sufficient evidential proof. Defining the sufficiency of such proof, the Court of Appeals observed that "it is incumbent upon the trial judge to demand less in the way of jurisdictional proof than would be appropriate at a trial stage." *Id.*

the oft-quoted statement in *Conley* of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" stating that the "no set of facts" language "has earned retirement" and "is best forgotten." *Twombly*, 127 S.Ct. at 1968–69 (quoting *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99).

■ Moreover, the Court, using a variety of phrases, indicated that more than an oblivious notice of a claim is needed to allege a violation. For example, the Court required "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the alleged claim]," "facts that are suggestive enough to render [plaintiff's allegations] plausible," "allegations plausibly suggesting (not merely consistent with) [plaintiff's allegations]," a "plain statement" with "enough heft" to show entitlement to relief, and "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1969–74. Finally, the Court refused to entertain a plaintiff's far-fetched flights of fancy by unambiguously stating that the line "between the factually neutral and the factually suggestive ... must be crossed [by allegations made in plaintiff's pleadings] to enter the realm of plausible liability," *id.* at 1966 n. 5, and stated that no "reassurances of plaintiffs' counsel" that discovery would soon flesh out plaintiff's claim, which is currently pled so that it is "just shy of a plausible entitlement," can prevent facial dismissal. *Id.* at 1967 and n. 6 (referring to *id.* at 1975 (Stevens, J., dissenting)). Thus, the plaintiff's complaint will survive facial dismissal only if it contains "enough [factual] heft" establishing the plaintiff's claims rather than plaintiff's conjecture, or self-serving interpretations of actual events, or mere "labels and conclusions, and a formulaic recitation of

the elements of a cause of action." *Twombly*, 127 S.Ct. at 1965–69; *accord Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *Phillips v. County of Allegheny*, 515 F.3d 224, 231–33 (3d Cir.2008).

## IV. PLAINTIFFS' ALLEGATIONS

### A. *Assertions as to Trade and Commerce*

Substantively, the Complaint opens with a section titled "Trade and Commerce." *See* Compl. ¶¶ 37–44. The section provides no citations to Plaintiffs' sources and reads as follows:

> Magnesium is the eighth most abundant element on earth and constitutes about two percent of the earth's crust. Magnesite is the naturally occurring carbonate form of magnesium.... China is estimated to have 80 percent of global magnesium reserves. Magnesite is mined from magnesium deposits and delivered from the mine to a crushing plant where it is crushed in three stages. Depending on the grade of the crushed material, the crushed magnesite ... produce[s] different forms of magnesite. There are three principal forms of magnesite sold in U.S. commerce. Dead-burned magnesite ("DBM") is produced by high temperature conversion of magnesite. DBM is used for the lining of metallurgical or refractory furnaces, used for the melting of steel, nonferrous metal and glass and the making of cement. Approximately 70 percent of the world's production of magnesite [results in] DBM. Caustic-calcined magnesite ("CCM") is produced by low temperature conversion. Approximately 22 percent of the world's production of magnesite [results in] CCM. [The] third type of magnesite [is] electro-fused magnesite ("EFM"), [and it] is produced by fusing CCM at high temperatures in an

electric arc furnace.... Approximately 8 percent of the world's production of magnesite [results in] EFM. China accounts for 80 percent of worldwide EFM production. During the period described in this Complaint, [that is, from April 2000 to at least the date of Plaintiffs' filing of the Complaint, September 7, 2005 ("Relevant Period"),] the international market for magnesite and magnesite products was dominated by [D]efendants.... Defendant producers have lower costs than their western competitors and[,] as a result[,] also dominate the group of manufacturers worldwide who can produce magnesite and magnesite products at costs below other producers. Exporters from China also enjoy a competitive advantage relative to manufacturers in other nations because China has employed a fixed currency exchange rate which undervalues the Yuan, making Chinese exports of magnesite and magnesite products to the United States relatively less expensive compared to exports of magnesite and magnesite products from other nations. During the period of this Complaint, the conduct of defendants and their coconspirators has taken place in and affected the interstate and foreign trade and commerce of the United States. Over 650,000 metric tons of magnesite are imported into the United States each year and over sixty percent of that is imported from China. U.S. Import of magnesite and magnesite products from China [during an unspecified period of time] exceed[s or exceeded] $50 million per year.

*Id.*

### B. *Anticompetitive Conduct*

The next section of the Complaint, titled "Factual Background," aims to state Plaintiffs' facts as to Defendants' alleged cartel-like activities. *See* ¶¶ 45–55. Plaintiffs'

sources as to these alleged facts are similarly not provided to the Court.

According to the Complaint: (a) in April of 2000, "thirteen producers and exporters of magnesite in China [unidentified in the Complaint] established a cartel called the 'Jiayuan Magnesite Export Group' for the export of magnesite, and reached agreement of fixing unified export prices to avoid competitive price cutting"; (b) "[d]uring the same [time,] a second cartel [was] formed[,] called 'Huaxia Magnesia Products Export Group' "; and (c) these "two cartel[s] ... represent more than 70 percent of the export volume of magnesite in China." *Id.* ¶ 45.

According to the Complaint, "[a]s a result of these cartel agreements, despite slumping demand [in markets unidentified in the Complaint, *i.e.,* either world-wide or in any region of the world], the price of magnesite and magnesite products increased [in geographic consumption markets also unidentified in the Complaint] during 2000 by over 45 percent compared to 1999. The president of the Jiayuan Magnesite Export Group reported by mid–2001 that [his/her] cartel's efforts had been successful and would generate an additional 50 million U.S. dollars [presumably, for his/her cartel]." *Id.* ¶ 46. The Complaint further asserts that

[the two cartels joined into] a single cartel under the name of the "Chinese Magnesite Export Association" [ ("CMA"), which grew to encompass] 23 exporting companies, including [those out of the seventeen named Defendants that were Chinese exporting companies]. Since April 2000, the [CMA] has conducted [an unspecified number of] cartel meetings of [D]efendants and other exporters. On March 22, 2003, at least 19 exporting companies, including [unspecified entities among D]efendants, met in Shenyang, China [and] agreed to

strengthen ... cooperation to reduce competition in exports of magnesite. The [CMA] agreed to establish itself under the name the "China Magnesite Forum" [6] and established goals of restraining competition and establishing limits on export supply in order to maintain and increase prices.... After achieving [unspecified] price increases, the cartel has successfully stabilized the prices of magnesite and magnesite products in the United States and avoided major price cutting despite [unspecified] low levels of demand [in unspecified geographic consumption markets]. During the period of the charged combination and conspiracy, [D]efendants ... have participated in [unspecified] meetings ... in China and elsewhere in which the prices, volume of sales, and markets for magnesite and magnesite products were ... agreed upon. Together, [D]efendants and their coconspirators dominate the production and sale of magnesite in the world and the United States.... Although non-cartel members represent 30 to 40 percent of the U.S. market, the cartel has been successful because [unspecified] other producers have higher costs for magnesite and magnesite products [and] currency costs [and] cannot compete [against Defendants]. Further[more, these other producers] have shown that they would follow price increases rather than undercut the [CMA's] price levels.... [T]he collusive arrangements [adopted among Defendants keeps resulting in] prices [that Plaintiffs believe to be] above those of a competitive market.... [P]rices of mag-

nesite in the animal feed industry [have] risen an overall 25 percent.

*Id.* ¶¶ 47–54.

### C. *Additional Elaborations*

Finally, Plaintiffs assert that:

Plaintiffs did not discover and could not discover, through the exercise of reasonable diligence, the existence of the claims sued upon [until an unspecified date/event] because [D]efendants ... actively, intentionally, and fraudulently concealed the existence of the combination and conspiracy from Plaintiffs ... through at least the time four years prior to the filing [by]

(a) Meetings which were kept secret from U.S. customers in which the prices, sales volumes, and markets for magnesite and magnesite products were discussed and agreed;

(b) Intentionally setting prices purportedly on a competitive basis when such prices were the result of collusion;

(c) Instructing members of the conspiracy at the above-described meetings not to divulge the existence of the conspiracy to others not in the conspiracy;

(d) Treating cartel agreements and meetings as confidential and proprietary information [and] enforc[ing] adherence to the agreed-upon price and supply agreements.

*Id.* ¶ 59.[7]

Plaintiffs' conclude their Complaint with allegations that "[t]he price of magnesite

---

**6.** It is unclear, from the face of the Complaint, whether the CMA assumed an "underground" name "China Magnesite Forum" or it was officially so renamed.

**7.** The Court is not entirely clear as to the purpose of this elaboration. While it appears plausible that Plaintiffs included these state-

ments in their Complaint to address the issue of statute of limitations (or the common law doctrine of laches), the Complaint is silent as to *when and how* Plaintiffs discovered the alleged conspiracy. *See generally*, Compl. Similarly, whilst these statements might be construed as Plaintiffs' attempt to elaborate

and magnesite products purchased by [P]laintiffs (and the [putative] classes) has been fixed [and] maintained [at] non-competitive levels," *id.* ¶ 60, and seek: (a) injunctive relief preventing Defendants from continuing the alleged combination and conspiracy; (b) monetary relief in the amount of "three-fold their damages;" and (c) legal costs and attorney fees. *See id.* at 13–14.

## V. INDUSTRY–RELATED DATA

The Court's careful reading of the twenty-one page Complaint yielded a total of eleven allegations providing the Court with statistical or statistics-related data. Three of these statistical allegations do not bear on the subject of the Complaint since they relate to the global tendencies in magnesite production processes, *i.e.:* (a) "70 percent of the world's production of magnesite [results in] DBM"; (b) "22 percent of the world's production of magnesite [results in] CCM"; and (c) "8 percent of the world's production of magnesite [results in] EFM." Compl. at 8. The remaining eight allegations relate to China's position in—and export of—magnesite and to Defendants' alleged cartel activities: (a) "China is estimated to have 80 percent of global magnesite reserves"; (b) "China accounts for 80 percent of worldwide EFM production"; (c) "Over 650,000 metric tons of magnesite are imported into the United States each year and over sixty percent of that is imported from China"; (d) "U.S. import of . . . magnesite products from China exceeds $50 million per year"; (e)

"[T]he price of . . . magnesite products increased during 2000 by over 45 percent compared to 1999"; (f) "The president of the Jiayuan Magnesite Export Group reported . . . that the cartel's efforts . . . would generate an additional 50 million U.S. dollars"; (g) "[N]on-cartel members represent 30 to 40 percent of the U.S. market"; and (h) "[P]rices of magnesite in the animal feed industry [had] risen an overall 25 percent." *See id.* at 8–12.

All above-quoted statistical data are presented by Plaintiffs without any reference to the sources of Plaintiffs' information. While the Court, on its own, is aware of certain sources that contain figures (or even allegations) quite similar to those of Plaintiffs, *see, e.g., Magnesium, Magnesite and Dolomite, A Strategic Global Business Report* (Global Indus. Analysts, Inc. Mar. 2008), license purchase available at <<http://www.reportlinker.com/p 087368/WorldMagnesium-Magnesite-and Dolomite-M>> ("Strategic Report"), such sources cannot serve as a basis for legal claim. For instance, the Strategic Report, a 425–page compilation, cannot operate as a factual basis for litigation since: (a) just as the Complaint, it fails to state its sources, hence allowing for presumption that the statements made therein are merely the authors' reading of the mix of industry rumors and verifiable facts; [8] and (b) it contains facially self-contradicting data.[9]

The foregoing, however, in no way suggests that a litigant cannot rely, for the

---

on their allegations that the CMA's unspecified members met during an unspecified number of meetings conducted at unspecified destinations "in China and elsewhere," the excerpt quoted above does not provide any specific information as to these alleged meetings. *See* Compl. ¶ 59.

8. The Strategic Report merely informs the reader that "[a] combination of primary and secondary research has been used for all find-

ings. The usage of obtained information is based on the perceived reliability of the source by the researcher. In many cases, a combination of such sources was used." Strategic Report at I–1

9. The Strategic Report provides conclusions virtually identical to those made in the Complaint, ¶¶ 37, 45–48:

Magnesium Product Producers and Marketing Enterprises established Huaxia Magne-

facts asserted in the litigant's pleadings, on a source containing statistical information bearing an imprimatur of reliability; and a litigant mounting a challenge related to international trade in magnesite is not in danger of facing paucity of sources. *See, e.g., U.S. Geological Survey, Magnesium Compounds* (U.S. Dept. of Interior), at <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/index.html#mcs>> ("Government Surveys").[10] The Government Surveys provide data relevant to Plaintiffs' statistical allegations as to China's magnesite resources and export practices. For instance, contrary to Plaintiff's assertion that "China is estimated to have 80 percent of global magnesite reserves," the Government Surveys provide statistical data indicating that, out of the

> sium Products Export Group in China.... This Group was formed to counter the problems of intense competition and low export prices.... Magnesite producing companies established [another] magnesite export group, in order to reach unified selling prices. The setting up of this group with 13 companies result[ed] in additional revenues of US$50 million per annum.... The group members agreed upon unifying prices and curb underselling practices thus enhancing magnesite revenues by US$50 million every year.... The China Magnesite Export Association was formed in February 2001 from two other groups, which were set up in 2000.... The primary goals of [this new association was] stabilizing export prices of magnesite....

Strategic Report, at II–106; III–123. And, just as Plaintiffs, the Strategic Report asserts that China is estimated to have 80 percent of global magnesite reserves, *see* Strategic Report, at II–109; III–123 ("China is home to about 80% of the global magnesite reserves.... About 80% of world's total magnesite resources are found in China"). However, these observations notwithstanding, the very same Strategic Report opens with the following statement:

> China, the world's leading supplier of magnesite, *boasts around 27% of the global magnesite resources.* Other leading producers of magnesite include Russia, North Korea

total of 3,600,000,000 tons of world magnesite reserves, China holds 860,000,000 tons (*i.e.,* 23.8%), being closely followed by North Korea (750,000,000) and Russia (730,000,000). *See* <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/mgcommcs04.pdf>>. Furthermore, relevant to Plaintiffs' other statistical statements, the Government Surveys indicate that:

(1) with respect to the United States' importation of magnesite products (*i.e.,* CCM, DBM and EFM, that is, the products subject to the Complaint, collectively, hereinafter, "Processed Magnesite"), China accounted, during the Relevant Period, for:

 (a) 67% to 76% of total importation (67% in 1999; 68% in 2000; 73% in

and Slovakia. Together, *these four countries account for nearly 83% of the overall global magnesite resources.*

Strategic Report, at II–5 (emphasis supplied). It appears self-evident that a litigant's claims cannot be based on a source containing unverifiable and, in addition, mutually exclusive data. *See, e.g., Ohio Midland, Inc. v. Proctor,* 2006 WL 3793311, at *4, 2006 U.S. Dist. LEXIS 85888, at *15 (S.D.Ohio Nov. 28, 2006) (plaintiff's allegations cannot be based on mutually exclusive facts); *accord Twombly,* 127 S.Ct. at 1965–69 (the complaint will survive only if it contains enough factual heft rather than conjecture); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (clarifying that judicial gatekeeping obligations apply to all technical testimony and providing a checklist of factors the courts should use in assessing the reliability of technical evidence).

10. For the purposes of final disposition, either on merits or on procedural grounds, a federal court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See* Fed.R.Evid. 201(b). However, at the instant juncture, the Court finds it premature to discuss whether judicial notice shall be taken of any Government Survey.

2001; 69% in 2002; 76% in 2003 and 2004; and 77% in 2005);

(b) import quantity ranging from 493,000 metric tons to 637,000 metric tons (515,000 in 1999; 637,000 in 2000; 493,000 in 2001; 542,000 in 2002; 529,000 in 2003; 575,000 in 2004; and 630,000 in 2005);

(c) gross profit per annum ranging from US$42,550,000 to US$90,290,-000 (42.55M in 1999; 43.35M in 2000; 45.63M in 2001; 50.42M in 2002; 59.35M in 2003; 82.3M in 2004; and 90.29M in 2005) and, thus, prices ranging from $68 per metric ton to $143 per metric ton ($82 in 1999; $68 in 2000; $92 in 2001; $93 in 2002; $112 in 2003; and $143 in 2004 and 2005);[11] and

(2) Chinese annual "total production" of magnesite ranged, during the Relevant Period, from 2,400,00 metric tons to 4,700,000 metric tons (2,400,000 in 1999; 2,450,000 in 2000; 3,580,000 in 2001; 4,560,000 in 2002; 4,600,000 in 2003; 4,650,000 in 2004; and 4,700,000 in 2005), i.e., the amount of Processed Magnesite exported by China to the United States varied from 11% to 26% of the total Chinese magnesite produced (21% in 1999; 26% in 2000;

13% in 2001; 11% in 2002 and 2003; and 12% in 2004 and 2005).

See <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/401499.pdf>>; <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/401400.pdf>>; <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/mgcmyb2001.pdf>>; <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/mgcomyb02r.pdf>>; <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/mgcomyb03.pdf>>; <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/mgcommyb04.pdf>>; and <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/mgcommyb05.pdf>> (collectively, "Government Surveys–Citations").[12]

The Government Surveys also provide information detailing shifts in the United States importation of Processed Magnesite during the Relevant Period, e.g.: (a) "[In 2000,] U.S. production of [DBM] dropped by about 9% from that in 1999, mostly because of the closure of National Refractories and Minerals Corp.'s Moss Landing, CA [ ('NRMC') ]. U.S. imports of [DBM] in 2000 increased by 28% from those in 1999.... [T]he *reasons for the significant increase in imports was to replace ... the domestically produced material ... lost*

---

11. *The Court's discussion does not detail the shifts in production from the cheaper CCM to the more expensive DBM and EFM, although these shifts affected the average price per ton.*

12. It appears self-evident that the data contained in the Government Surveys contradicts many of Plaintiffs' allegations. For example, while China accounted for up to 77% of Processed Magnesite exportation into the United States, such importation did not reach 650,-000 metric tons even by the end of the Relevant Period; rather, it ranged from 493,000 metric tons to 637,000. Similarly, while Chinese annual gross profit from Processed Magnesite ranged from US$42,550,000 to US$90,-290,000, the prices did not "increase during

2000 by over 45 percent compared to 1999," as Plaintiffs assert: rather, the prices *decreased* by 11%, falling from $82 per ton in 1999 to $68 per ton in 2000. Analogously, contrary to Plaintiffs' assertion that "[t]he president of [one of the alleged original, *i.e.,* smaller cartels] reported that the cartel's efforts ... generate[d] an additional 50 million U.S. dollars [presumably, for the cartel, per annum]" the Government Surveys indicate that the *entire Chinese exportation* of Processed Magnesite over *all six years of the Relevant Period* grew from US$42,550,000 to US$90,290,000, that is, less than 50 million U.S. dollars.

when [NRMC] closed"; (b) "[In 2001, a] *general economic downturn led to decreasing demand* for [CCM], *and as a result, production and imports declined* by 20% ... from the 2000 levels. U.S. imports of [DBM] in 2001 declined significantly, with the imports from China, the main source country, declining by more than 100,000 metric tons"; (c) "[In 2002,] imports of [CCM] and [DBM] rose in 2002. U.S. imports of [DBM] in 2002 were about 9% higher than those in 2001.... Imports of [CCM] were 14% higher than those in 2001"; (d) "[In 2003,] imports of [DBM] fell by about 4% from those in 2002.... Imports of [CCM] ... were slightly higher than those in 2002"; (e) "[In 2004,] imports of [DBM] increased by about 10% from those in 2003.... Imports of [CCM] were about 5% higher than those in 2003"; (f) "[In 2005,] imports of [DBM] increased by about 14% .... Imports of [CCM] were about 3% less than those in 2004." *See id.* (emphasis supplied). The Court, therefore, examines the content of Plaintiffs' Complaint in light of availability of precise statistical and factual data with respect to the United States importation and Chinese exportation of Processed Magnesite.

## VI. PERTINENT LEGAL REGIME

### A. *The Sherman Act*

Plaintiffs assert that Defendants violated Section 1 of the Sherman Act.[13] *See*

Compl. ¶ 1. The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."[14] 15 U.S.C. § 1. "To establish a violation of Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action [was] illegal; and (4) that [the plaintiff] was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir.2005) (citations omitted), *cert. denied*, 547 U.S. 1092, 126 S.Ct. 1777, 164 L.Ed.2d 557 (2006). A related statute, the Clayton Act, provides a litigant with the right of private action to vindicate violations of the Sherman Act. *Accord* Compl. ¶ 3 (asserting that Plaintiffs bring the instant action pursuant to the Clayton Act, 15 U.S.C. §§ 4 and 16).

### 1. "Per Se" and "Rule of Reason" Analyses

 To determine whether a particular action unreasonably restrains trade, courts apply either the *"per se"* analysis or the "rule of reason." Under the *per se* rule, certain types of restraints are presumed to be unreasonable, hence enabling the court to avoid an elaborate economic

---

**13.** Turning to the venue of the instant action, Plaintiffs assert that the matter is properly before this Court, because Plaintiffs, that is, Animal Science, a Texas corporation, and Resco, a Pennsylvania corporation, are suing seventeen Defendants, one of which, that is, Minmetal, is a New Jersey corporation (with the remaining sixteen Defendants being Chinese entities). *See* Compl. ¶¶ 5–7.

**14.** The "commerce with foreign nations" component of the statute is no more self-explanatory than its domestic counterpart. Just as the federal courts developed, over the time, a body of federal case law interpreting

the Sherman Act for the purposes of domestic antitrust cases, *see State Oil Co. v. Khan*, 522 U.S. 3, 20–21, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 103 (2d ed. 2000) (federal courts have been invested "with a jurisdiction to create and develop an 'antitrust law' in the manner of the common law courts"), the courts also developed common-law-like tests for determining when the Act applies to foreign conduct. *See* Part V(B) of this Opinion for discussion of the "foreign conduct" antitrust regime.

effect inquiry. *See, e.g., Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) ("*per se* rules are appropriate only for 'conduct that is manifestly anticompetitive' ") (quoting *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)). If a restraint is *per se* illegal, further examination of the practice's impact on the market is unnecessary for finding that it produced adverse, anticompetitive effects within relevant product and geographic markets. *See Pace Elecs., Inc. v. Canon Computer Sys., Inc.*, 213 F.3d 118, 123 (3d Cir.2000) ("[the *per se* ] standard, which is based on considerations of 'business certainty and litigation efficiency,' allows a court to presume that certain limited classes of conduct have an anticompetitive effect without engaging in the type of involved, market-specific analysis ordinarily necessary to reach such a conclusion"). *Per se* liability is reserved for only those agreements that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006). Examples of agreements which implicate the *per se* rule include horizontal price-fixing arrangements, market allocation, group boycotts and some "tying" arrangements. *See, e.g., Socony–Vacuum Oil Co.*, 310 U.S. at 223, 60 S.Ct. 811 (declaring *per se* illegal any agreement "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce"); *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (holding that "[t]raditional 'hardcore' price fixing remains *per se* unlawful"); *United States v. Andreas*, 216 F.3d 645, 667 (7th Cir.2000) (finding *per se* illegal a sales volume allocation agreement, an output restriction, that necessarily furthered a practice of price fixing).

■ In contrast, the rule of reason, which is the "prevailing standard," ordinarily requires the court to engage in a detailed analysis of the effect that the restraint had or is having on competition in a relevant market. *See GTE Sylvania Inc.*, 433 U.S. at 49, 97 S.Ct. 2549 (holding that the rule of reason typically requires a detailed examination "in light of the competitive situation in the product market as a whole"); *United States v. Brown Univ.*, 5 F.3d 658, 672 (3d Cir.1993) (holding that the rule of reason "ordinarily requires a detailed inquiry into the market impact of a restraint"). Typical examples of the conduct subject to the rule of reason analysis are agreements to exchange pricing information, certain "tying" arrangements, vertical non-price restraints, customer rebates and discount programs, promotional allowances to dealers and cooperative advertising programs, exclusive distributorships, etc. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *United States v. Citizens & Southern National Bank*, 422 U.S. 86, 113, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975); *United States v. Loew's Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *see also* ABA Sec. of Antitrust L., *Antitrust Law Developments* 50–78 (5th ed. 2002).

■ However, the issue of whether the court should assess the allegedly illegal conduct under the *per se* rule or the rule of reason does not depend on the litigants' positions as to which rule should apply, nor does it depend on the labels utilized in the complaint: only the plaintiff's factual assertions allow the court to utilize the curtailed *per se* analysis. *See Expert Mason-*

ry, Inc. v. Boone County, Kentucky, 440 F.3d 336, 344 (6th Cir.2006) (To determine if restraints are per se illegal, courts look to the circumstances, details, and logic of a restraint to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction may be reached.); *see also GTE Sylvania Inc.*, 433 U.S. at 58–59, 97 S.Ct. 2549 (observing that "departure from the rule-of-reason standard [in antitrust law] must be based upon demonstrable economic effect rather than ... upon formalistic line drawing"); *see also Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 724–726, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) (reiterating twice the preference for considering substantial economic effect, rather than formalism).

## 2. Parallel Pricing

■ As a matter of substantive antitrust law, it has long been established that defendants' mere parallel conduct, even if it is consciously parallel, does not violate Section 1 of the Sherman Act. *See, e.g., Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 541, 74 S.Ct. 257, 98 L.Ed. 273 (1954).

> Indeed, such conduct is commonplace and often efficient. Of course, parallel conduct can result from an agreement between competitors, and such an agreement could violate Section 1. But an allegation of agreement under Section 1 must rest on something more than allegations of parallel conduct, lest commonplace and efficient economic behavior provide a sufficient basis for costly litigation over largely groundless claims. Nor can a mere conclusory allegation of an agreement or conspiracy suffice to convert allegations of parallel conduct into an adequate allegation of a violation of Section 1.

*Bell Atlantic Corp. v. Twombly*, 2006 WL 2482696, at \*9, 2005 U.S. LEXIS Briefs 1126, at \*9–10 (Brief for the United States, as Amicus Curiae Supporting Petitioners).

Consequently, the Supreme Court held that mere allegations that defendants engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting an illegal agreement to that effect, were insufficient to state a claim under Section 1 of the Sherman Act. *See Twombly*, 127 S.Ct. at 1964. Consequently, to duly assert a violation, allegations of parallel conduct must be placed in a factual context which raises a plausible suggestion of a preceding agreement rather than identical independent action, since a defendant's business activity could be an entirely natural, unilateral reaction of the defendant to the business activities by defendant's competitors. *See Twombly*, 127 S.Ct. at 1964 ("Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express").

## B. The Foreign Trade Antitrust Improvements Act

### 1. Legislative History

Known as "inelegantly phrased," *Carpet Group*, 227 F.3d at 69, the Foreign Trade Antitrust Improvements Act ("FTAIA") is an adjunct of antitrust jurisprudence: the statute rarely appears on the pages of case law and, even when it does so, it is often misconstrued. *See Turicentro, S.A. v. Am. Airlines, Inc.*, 303 F.3d 293, 299 (2002) ("Although [the FTAIA was] passed two decades ago, few federal courts have had occasion to apply [it]"); *see also* Makan Delrahim, *Drawing the Boundaries of the Sherman Act: Recent Developments in the*

*Application of the Antitrust Law to Foreign Conduct*, 61 N.Y.U. Ann. Surv. Am. L. 415 (2005) (surveying the complexities of the statute revealed by FTAIA litigations).

The Supreme Court first addressed the applicability of the Sherman Act to conduct abroad in *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826, in 1909, a time when the United States was less economically interconnected with much of the world than today. The *American Banana* Court relied on a tort principle (namely, the conflict-of-laws rule that the legality of an act "must be determined wholly by the law of the country where the act is done") to conclude that wholly foreign conduct in a foreign country did not state a Sherman Act claim. *See id.* at 356, 29 S.Ct. 511. Sherman Act jurisprudence matured, however, and the certainty expressed in *American Banana* began to dissolve when cases came to the Court involving conduct not wholly foreign and with more obvious effects on United States commerce. *See e.g., United States v. Sisal Sales Corp.*, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927) (involving a conspiracy to monopolize Mexican sisal exports and American sisal sales).

By 1945, the modern view crystallized in *United States v. Aluminum Co. of America* ("*Alcoa*"), 148 F.2d 416 (2d Cir.1945), a case that seems contemporary because it involved a foreign company as a participant in a foreign cartel that affected United States prices. The Second Circuit, sitting as court of last resort and speaking through Judge Learned Hand, held that the Sherman Act reached conduct abroad

that was intended to affect—and did in fact have a significant effect on—United States commerce. *See id.* at 444. Hence, the situs of the effects, as opposed to the conduct, therefore determined whether the court presented with a foreign conduct-based antitrust challenge had the necessary jurisdiction to entertain the challenge under the Sherman Act.[15]

Legislating on this background, Congress in 1982 enacted [the FTAIA] to clarify the application of United States antitrust laws to foreign conduct [in order to] promote [*inter alia*,] the "certainty in assessing the applicability of American antitrust law to international business transactions and proposed transactions."

*Turicentro*, 303 F.3d at 298–99 (quoting H.R. REP. NO. 97–686 (1982), *reprinted* in 1982 U.S.C.C.A.N. 2487, 2494); *see also United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 952 (7th Cir.2003) ("If FTAIA sets out an issue on the merits, resolution of the issue could be delayed until late in the case, [hence, creating] an effect on foreign markets ... while the case remained pending.... Treating the matter as one of subject matter jurisdiction reduces the potential for offending economic policies of other nations. [The] FTAIA limits the power of the United States courts (and private plaintiffs) from nosing about where they do not belong. And the power of the courts is precisely what subject matter jurisdiction is about.").

## 2. Methodology of the FTAIA Analysis

The FTAIA sets forth a general rule that excludes from the scope of the Sher-

---

**15.** The "effects test" has prevailed consistently since *Alcoa,* and by 1993 the Supreme Court declared that the law is "well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." *See Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 796, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993).

man Act all conduct involving "non-import" foreign commerce unless two conditions are met: (1) the alleged conduct has a "direct, substantial and reasonably foreseeable effect" on United States domestic commerce; and (2) the domestic anti-competitive effect "gives rise to" a claim under the Sherman Act. *See* 15 U.S.C. § 6a. Thus, the FTAIA poses the following three-prong inquiry.[16]

■■■ First, the FTAIA asks whether all defendants were "involve[d in] import trade or import commerce." *See Carpet Group*, 227 F.3d at 69, 72. If all that defendants were doing was *actually* bringing goods or services *into the United States*, then the FTAIA (and the FTAIA's requirement for "direct, substantial and reasonably foreseeable effect") is not even triggered, *i.e.*, the claim squarely falls within the scope of the Sherman Act. *See Turicentro*, 303 F.3d at 302 ("[While the FTAIA] does not define the term 'import,' . . . the term generally denotes a product (or perhaps a service) has been brought into the United States from abroad") (citing Webster's Third New Int'l Dictionary (1986); Black's Law Dictionary (6th ed. 1990)). However, if "[d]efendants *did not directly bring items or services into the United States* . . . , they cannot be labeled 'importers,' [nor it could be said that defendants] have they engaged in 'import trade or commerce.'" *See id.* (emphasis

supplied). In other words, even if a certain importer purchased or otherwise obtained the defendants' product in a foreign market (be it the defendants' national market or any other market) and brought the defendants' product into the United States, the fact that the product eventually found its way into the United States does not transform the defendant into an "importer" and, hence, an antitrust claim against the defendants must pass muster under the FTAIA before the Sherman Act claim can be entertained. *See id.* at 304 (The fact "[t]hat 'some of the goods purchased in [a foreign market] may ultimately have been imported by individuals into the United States' [is] immaterial to determining if defendants [are] involved in 'import trade or import commerce' [since the defendants' own] actions did not *directly* increase or reduce imports into the United States") (quoting *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 395 (2d Cir.2002), emphasis supplied).

■■■ Once it is determined that the defendants are not actual importers or that they were importing goods all over the world, the FTAIA is triggered. However, the FTAIA bar does not exclude every possible conduct by the defendants which are not directly importing into the United States from the reach of the Sherman Act. Rather, the second prong of the inquiry must be conducted, namely, whether the

---

**16.** Section 6a of the FTAIA provides, in relevant part, that:

[The Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial and reasonably foreseeable effect—

(A) [on domestic, *i.e.*, interstate] trade or commerce, or on import trade or import commerce with foreign nations . . .

(2) such effect gives rise to a claim under the provisions of Sections 1 to 7 of [the Sherman Act].

15 U.S.C. § 6a. The Court notes, in passing, that the three-prong inquiry discussed in the instant Opinion reflects solely the aspects of FTAIA pertinent to the case at hand: in light of the complexities of FTAIA, the Court finds it prudent to omit from the discussion an alternative FTAIA scenario not implicated by the case at bar, *i.e.*, that of effects "on export trade or . . . commerce with foreign nations" by an entity exporting goods or services from the United States. 15 U.S.C. § 6a(1)(A) and (1)(B).

862

defendants' alleged conduct "involv[e]d trade or commerce with foreign nation." *See* 15 U.S.C. § 6a. Generally, "where [the defendants'] conduct ... is directed at the competitiveness of a foreign market, such conduct involves 'foreign trade or commerce.'" *See See Turicentro*, 303 F.3d at 302 (quoting *Kruman*, 284 F.3d at 395) ("When there is conduct directed at reducing the competitiveness of a foreign market ... such conduct involves foreign trade or commerce, regardless of whether some of the conduct occurred in the United States"). Hence, if the foreign defendants are not involved in importation into any foreign market, *i.e.*, if they operate only within their own domestic market, the FTAIA bars antitrust suits against such defendants by removing subject matter jurisdiction of a United States court to entertain Sherman Act claims against such defendants, even if certain ripple effects of the defendants' conduct reach the United States' market.

However, if the answer to the second prong is in affirmative, *i.e.*, if the foreign defendants are involved in importation into foreign markets (which may or may not include the United States), then the third prong of the inquiry comes into play. *See* 15 U.S.C. § 6a(2). Specifically, the court shall determine whether the foreign defendants' export activities (*i.e.*, the defendants' bringing of their goods or services into markets other than their own) caused "direct, substantial and reasonably foreseeable effect" on the United States' market, i.e., either on our nations' interstate commerce or on the importation into the United States. *See id.* Once this third prong is satisfied, the court establishes its subject matter jurisdiction to examine the sufficiency of plaintiff's claim pursuant to the Sherman Act. *See id.* at 301.

## 3. Direct, Substantial, and Reasonably Foreseeable Effect

The courts agree that participation by American firms in the alleged conspiracy does not, by itself, establish an anticompetitive effect in the United States. *See Kruman*, 284 F.3d at 395. Similarly, mere intent of defendants to reduce competition in the United States is insufficient to meet the "direct effect" standard. *See Dee–K Enters., Inc. v. Heveafil Sdn. Bhd.*, 299 F.3d 281, 292 (4th Cir.2002), *cert. denied*, 539 U.S. 969, 123 S.Ct. 2638, 156 L.Ed.2d 675 (2003). To establish "direct effect," the plaintiff must show a causal link between the *wrongful conduct* and the *anticompetitive effect* suffered in the United States. *See United States v. LSL Biotechnologies*, 379 F.3d 672, 680 (9th Cir. 2004) ("[A]n effect is 'direct' if it follows as an immediate consequence of defendant's activity"); *Info. Res. Inc. v. Dun & Bradstreet Corp.*, 127 F.Supp.2d 411, 417 (S.D.N.Y.2000); *Eurim–Pharm GmbH v. Pfizer Inc.*, 593 F.Supp. 1102, 1106–07 (S.D.N.Y.1984) (finding no jurisdiction under the FTAIA when "the link between the defendants' conduct abroad and the price ... in the United States is far from apparent"); *see also In re Monosodium Glutamate Antitrust Litig.*, 2005 WL 2810682 (D.Minn. Oct. 26, 2005) (to avoid the FTAIA bar, the plaintiff must show "proximate" causation, not just "but for" causation, between the alleged domestic effects of defendants conduct and the defendants' alleged worldwide activities); *Latino Quimica–Amtex S.A. v. Akzo Nobel Chemicals B.V.*, 2005 WL 2207017 (S.D.N.Y. Sept. 8, 2005) (same); *eMag Solutions LLC v. Toda Kogyo Corp.*, 2005 WL 1712084 (N.D.Cal. July 20, 2005) (same); *accord Sniado v. Bank Austria AG*, 378 F.3d 210 (2d Cir.2004) (declining subject matter jurisdiction where plaintiff asserted a worldwide exchange rate fixing scheme but did not characterize the

scheme as even a but—for cause of his injury). Thus, mere spillover effects within the United States caused by a conspiracy targeting foreign markets are not sufficiently "direct" to satisfy the FTAIA, *see Eurim–Pharm GmbH*, 593 F.Supp. at 1106, just as mere ripple effects felt in the United States as a result of anticompetitive conduct abroad are not sufficiently "substantial" to meet FTAIA requirements. *See Turicentro*, 303 F.3d at 304 ("[p]laintiffs' alleg[ations that] defendants' conduct ... substantially reduced [plaintiffs'] business values, forcing at least one member of the putative class out of business [do not state] any 'effect' on United States commerce"); *Dee–K Enters. Inc.*, 299 F.3d at 292.

### 4. Additional Considerations

#### a. *Comity*

In *Hartford Fire*, nineteen of the U.S. States and numerous U.S. private plaintiffs filed complaints alleging that the defendants, which consisted of four domestic primary insurers, domestic reinsurers, brokers and trade associations, as well as reinsurers based in London, United Kingdom, violated the Sherman Act by engaging in various conspiracies that forced certain other primary insurers to change the terms of their standard domestic insurance policies. After the actions were consolidated for litigation, the District Court for the Northern District of California granted the defendants' motions to dismiss, primarily on the grounds of antitrust immunity, pursuant to the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1015. *See In re Insurance Antitrust Litigation*, 723 F.Supp. 464 (N.D.Cal.1989). The Court of Appeals for the Ninth Circuit reversed the district court's conclusion with respect to the McCarran–Ferguson Act and, in addition, the court rejected the district court's conclusion that the principle of international comity barred the court from exercising Sherman Act jurisdiction over the claims brought solely against the London reinsurers.[17] *See In re Insurance Antitrust Litig.*, 938 F.2d 919 (9th Cir.1991). Upon grant of certiorari, the Supreme Court affirmed in part and reversed in part. *See Hartford Fire Ins. Co. v. Cal.*, 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993). Justice Souter, delivering the opinion of the Court, observed:

> The only substantial question in this litigation is whether "there is in fact a true conflict between domestic and foreign law." *Societe Nationale Industrielle Aerospatiale v. United States Dist.*

---

17. The term "comity" describes a theory for accommodating conflicting legal policies of territorial sovereigns; it was developed by scholars in 17th-century by Dutch scholar Ulrich Huber to resolve conflicts between the laws of the various Dutch provinces. *See* Davies, *The Influence of Huber's de Conflictu Legum on English Private International Law*, 18 Brit. Y.B. Int'l L. 49, 52 (1937). Huber summarized his analysis into three now well-known axioms: (1) the laws of every sovereign authority have force within the boundaries of its state, and bind all subject to it, but not beyond; (2) those are held to be subject to a sovereign authority who are found within its boundaries, whether they be there permanently or temporarily; (3) those who exercise sovereign authority so act from comity, that the laws of every nation having been applied within its own boundaries should retain their effect everywhere so far as they do not prejudice the powers or rights of another state and another state's courts. *See id.* at 26. Thus, the legal doctrine of international comity is not a rule of public international law but a judicial tradition based on respect for sovereignty, a discretionary power of the court to decline jurisdiction in international cases out of respect for the actions and laws of another nation, which are weighed against United States international convenience and duties. *See Bodner v. Banque Paribas*, 114 F.Supp.2d 117, 129 (E.D.N.Y.2000) (citing *Societe Nationale Industrielle Aerospatiale*, 482 U.S. at 555, 107 S.Ct. 2542).

*Court for Southern Dist. of Iowa,* 482 U.S. 522, 555, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987). The London reinsurers contend that applying the [Sherman] Act to their conduct would conflict significantly with British law [governing their conduct], and the British Government, appearing before [the Supreme Court] as *amicus curiae,* concurs. . . . But this is not to state a conflict. "The fact that conduct is lawful in the state in which it took place will not, of itself, bar application of the United States antitrust laws," even where the foreign state has a strong policy to permit or encourage such conduct. . . . No conflict exists, for these purposes, "where a person subject to regulation by two states can comply with the laws of both." Restatement (Third) Foreign Relations Law § 403, Comment e. 25. Since the London reinsurers do not argue that British law requires them to act in some fashion prohibited by the law of the United States, . . . or claim that their compliance with the laws of both countries is otherwise impossible, we see no conflict with British law. *See* Restatement (Third) Foreign Relations Law § 403, Comment e, § 415, Comment j. We have no need in this litigation to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on grounds of international comity.

*Hartford Fire,* 509 U.S. at 798–99, 113 S.Ct. 2891 (citations to parties' and *amici* briefs omitted).

Consequently, the *Hartford Fire* Court concluded that comity did not prevent the district court from entertaining the plaintiff's claim under the specific set of facts presented by the case, but stressed that all inquiries implicating a sovereign's actions, including inquiries examining the effect a sovereign's actions might have on global operations of the entities under the sovereign's domain, are necessarily fact specific. *See id.* at 797, 113 S.Ct. 2891 (discussing the totality of factors).

### b. *"Mixed FTAIA"* Scenario

The Court of Appeals for the Fourth Circuit in *Dee–K Enters.,* 299 F.3d 281, built on the Supreme Court's teaching in *Hartford Fire.* In *Dee–K Enterprises,* two United States companies that purchased rubber thread filed a putative antitrust class action alleging a price-fixing conspiracy led by Southeast Asian producers of the thread. The plaintiffs named, as defendants, nine Southeast Asian producers of rubber thread and some of their subsidiaries and distributors in the United States,[18] and alleged that the plaintiffs: (a) paid "artificially high and non-competitive prices"; (b) "were deprived of free and open competition in the market"; and (c) "the competition among defendants . . . was restrained" in the United States *and throughout world. See id.* at 284.

> [The plaintiff] introduced substantial evidence at trial of horizontal price fixing among the producers. This price fixing apparently originated at least in part in reaction to 1991 threats by the United States government to punish Southeast Asian rubber-thread producers for violating antitrust prohibitions. . . . In December 1991, responding to the dumping

---

18. Specifically, the plaintiffs named, as defendants, five Malaysian companies, two Indonesian, two Thai, as well as three United States wholly-owned subsidiaries of the Malaysian companies and two United States independent distributors used by other producers. *See Dee–K Enters., 299 F.3d at 283–84.* In

other words, the scenario examined in *Dee–K* presented substantially more ties to the United States market than the case at bar, where the sole connection is the existence of a single United States subsidiary of one of sixteen other Defendants.

accusations, officials of the Malaysian producers ... met with a Malaysian government official and agreed to fix [Malasian] rubber-thread prices throughout the world. Later joined by other rubber-thread producers from Malaysia, Indonesia, and Thailand, they continued to meet for several years, at conventions and in other settings, to discuss and implement these and other efforts to fix prices. They met regularly between 1992 and 1995—in Kuala Lumpur, in Columbo, in Bali, and in Penang [but] never met in the United States.... From 1991 to 1996, United States prices for rubber thread ... generally rose, [and the plaintiff] attributes these increases to the price-fixing conspiracy.... At the conclusion of [the] trial, the district court submitted a special verdict form to the jury [asking, *inter alia,* whether] "the conspiracy ha[d] a substantial effect in the United States" [and] the jury answered [this] question in the negative [causing the plaintiff's appeal].

*Id.* at 284–85. The Fourth Circuit did not disturb the jurors' finding. The court conducted a two-prong inquiry, first agreeing with the district court's conclusion that the plaintiffs' allegations clearly implicated the FTAIA because the alleged price-fixing conspiracy constituted a "foreign conduct" in light of the plaintiffs' assertion of "a largely foreign conspiracy with some domestic elements, aimed at a global market including, but certainly not limited to, a United States import market." *Id.* at 286–93 (providing an extensive discussion of the FTAIA and refusing to read the language in *Carpet Group,* 227 F.3d at 75, and *United States v. Nippon Paper Indus.,* 109 F.3d 1, 9 (1st Cir.1997), as contradicting the FTAIA's legislative history, the position of the Department of Justice, the Supreme Court's holding in *Hartford Fire* and the positions of all other circuit

and district courts). The court stressed that, in determining whether the FTAIA applies,

a court should consider whether the [defendants'] *acts, targets, and effects* ... are *primarily* foreign or *primarily* domestic. This inquiry will best accommodate the cases with mixed fact patterns, defying ready categorization as "foreign" or "domestic" conduct, which our increasingly global economy will undoubtedly produce. We cannot begin to foresee the scope or complexity of future transactions. To adopt simplistic rules ... might well yield unintended and unfortunate results.... We note that this approach echoes that of the Third Circuit in *Carpet Group* and finds support in several of the treatises.

*Id.* at 294 (citing *Carpet Group,* 227 F.3d at 75; Wilbur L. Fugate, *Foreign Commerce and the Antitrust Laws* § 2.12 at 80–82 (5th ed. 1996); Restatement (Third) of Foreign Relations Law § 415(2), and *Montreal Trading Ltd. v. Amax, Inc.,* 661 F.2d 864, 869 (10th Cir.1981)) (emphasis supplied). Then, the court concluded that, even in a scenario where the plaintiffs actually proved horizontal price fixing, the allegations that "the agreements ... were all formed entirely outside the United States—in several other countries, [the] target of the conspiracy was a global market, [and the] links to the United States are mere drops in the sea of conduct that occurred ... around the world" fail to establish that the defendants' activities caused the "direct, substantial and reasonably foreseeable effect" on the United States trade necessary to remove the FTAIA bar. *Id.* at 295–96; *accord Eurim–Pharm GmbH,* 593 F.Supp. at 1106; *accord Turicentro,* 303 F.3d at 304. Thus, *Dee–K Enterprises* stands for the proposition that the FTAIA bars claims failing to establish not only a clear link between the

defendants' illegal conduct and the United States trade and commerce, but also that the United States trade was, at the very least, "a" focus point of the defendants' illegal conduct.[19] *Cf. Int'l Ass'n of Machinists & Aerospace Workers v. OPEC*, 649 F.2d 1354, 1359 (9th Cir.1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982) (finding no jurisdiction over claims against a world-wide combination of petroleum producers under the act-of-state doctrine); *compare Carpet Group*, 227 F.3d at 73 (Congress did not intend to remove federal jurisdiction in the cases which *clearly involve conduct in the United States* rather than abroad)

## VII. DISCUSSION

### A. *Presumption as to Lack of Sovereign Action*

■ Plaintiffs name as Defendants in this action sixteen Chinese business entities and Minmetals, a wholly owned United States subsidiary of one of these sixteen entities. *See* Compl. ¶¶ 9–25. It is axiomatic that a business entity cannot conspire with its wholly-owned subsidiary for purposes of the Sherman Act liability, *see Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), and Plaintiffs' antitrust claims against Minmetals could be plausible only if the Court is to supplement Plaintiffs' claim with an allegation (not stated in the Complaint but suggested by Plaintiffs during the October 6, 2008, oral argument) that Minmetal conspired with Defendants *other* than its parent company. Plaintiffs' failure to plead so is, however, of less concern to this Court than Plaintiffs' silence as to the comity implications raised by this matter.

The People's Republic of China ("China" or "State") was formally established on October 1, 1949 when, after a victory by the Communist Party of China, Mao Zedong proclaimed the creation of a communist state, hence triggering the State's centrally planned economic system.[20] *See*

---

**19.** This Court finds the holding of *Dee–K Enterprises* both insightful and sensitive to the realities of the modern, progressively globalized world trade: any holding otherwise risks creating a judicial rule undermining the legislative rationale of the FTAIA. To illustrate, if one is to presume that there is a cartel of producers-importers of a certain merchandise which: (a) operates world-wide, without focusing on the United States market; and (b) sell its merchandise in the United States at the cheapest prices, comparing to those charged for comparable merchandise by domestic producers and other importers (as it is the case with Chinese Processed Magnesite), a blind application of United States antitrust law to such cartel could, inadvertently, create an effect diametrically opposite to the goal of the Sherman Act. Specifically, such blind application of United States antitrust law could cause the United States a self-imposed "quasi-embargo," in the sense that the cartel—after being found in violation of the Sherman Act—might elect not to change its pricing practices but rather to avoid the reach of the United States law by simply selling *all* its merchandise in non-United States markets. Such self-imposed quasi-embargo would, in turn, create a dire shortage of the merchandise in the United States and, hence, an incentive for numerous intermediaries to profiteer from this shortage by re-selling the cartel's merchandise in the United States purchased in foreign markets: this scenario would result in higher prices paid by United States consumers—even if the intermediaries diligently compete against each other within the meaning of the Sherman Act—since the intermediaries would sell the merchandise in the United States at prices necessarily exceeding those paid by them to the cartel (simply because the intermediaries would have no business incentive to import the merchandise in order to sell it at the price below those that they themselves paid, or at cost).

**20.** In a centrally planned economy, the state government controls all (or, at least, all major) sectors of the economy and formulates all decisions about their use, *i.e.*, the government decides what should be produced, as well as the quantities and situs of production, and

<<https://www.cia.gov/library/ publications/theworld-factbook/geos/ch. html# Intro>> ("China–Intro"). However, in 1978, "China adopted its open-door policy and allowed its economy to be exposed to the international market, [coining] what Deng Xiaoping called 'socialism with Chinese characteristics.'" Lan Cao, *Public Perspectives on Privatization: Chinese Privatization: Between Plan and Market ("Public Perspectives ")*, 63 Law & Contemp. Prob. 13, 13 (2000). The reforms started with the phasing out of collectivized agriculture and expanded, in a piecemeal fashion, to include gradual liberalization of prices, fiscal decentralization and growth of the non-state sector. *See* China–Intro; *Public Perspectives* at 18, 28. However, "Chinese [government] deferred state-sector privatization and focused on establishing the fundamentals of a market-oriented economy ... in the newly created non-state sector." *Public Perspectives* at 22. Therefore, "the state sector remain[ed] remarkably large, [and, by the year 2000,] China [still had] more than 200 million people employed in its 340,000 state owned enterprises, which account[ed] for thirty-four percent of the country's total industrial output, fifty-seven percent of its total fixed asset investment, and more than one-third of its GDP." *Id.* at 32 (citations omitted). "Like other centrally planned economies in transition, the purchase of inputs and sale of outputs [by state-owned enterprises] in China remain[ed] linked to the central planning system despite efforts to de-link

portions of the economy from the central plan." *Id.* at 26.

The issue of which commodities and industries [must be still] subjected to price regulation and economic plan is first settled on the state-wide level and then at the provincial level, where each province can designate additional commodities or industries as essential and subject them to the province's own [central] economic plan. For example, on the state level, China regulates such commodities as meat, sugar, and vegetables as well as public services, new technology sectors, industries related to state security, banking, and insurance. Conversely, such industries as coal, machine-building, electronics, and textiles are not subject to the state-wide control. However, these industries could be controlled [upon or without an express State's mandate] on a local level. For example, [certain] Provinces considered chemicals, building materials, metallurgy, and machine building essential enough to be regulated by the provinces' economic plans.

*Id.* at 33, n. 101 (citations omitted).

In the case at bar, Plaintiffs enlighten this Court as to the juridical status of Defendants only by stating that one of Defendants is a "Chinese state-owned trading company," while another is a "Chinese directly owned state company." *See* Compl. at 2–3. With respect to fourteen other Defendants, Plaintiffs merely informed the Court that these Defendants

---

sets the prices at which the products are to be sold. Planned economies are in contrast to unplanned economies, such as a market economy, where production, distribution, pricing, and investment decisions are made by the private owners of the factors of production based upon their own and their customers' interests rather than upon furthering some overarching governmental macroeconomic plan. *See* Daniel Myers, *Construction Eco-*

*nomics* 288 (2004); Bertell Ollman, *Market Socialism: The Debate Among Socialists* 12 (Routledge, 1997); Alec Nove, *Planned Economy*, in *The New Palgrave: A Dictionary of Economics*, vol. 3 at 879 (1987); <<http:// www.enotes.com/biz-encyclopedia/centrally-planned-economy>>; <<http://dictionary. reference.com/browse/planned% 20economy>>.

are either "Chinese trading companies" or "Chinese corporations," *see id.* at 3–5, leaving the Court to guess whether Defendants are: (a) wholly owned by the State and, thus, are nothing but the State's assets/instrumentalities; or (b) now-privatized or newly-created private entities obligated to operate in its domestic, as well as foreign, markets subject to certain State-wide and/or Province(s)-wide price and production economic plans; or (c) enterprises operating outside Chinese regulatory constraints; or (d) different combinations of the above-listed choices. *See Mannington Mills, Inc. v. Congoleum, Corp.*, 595 F.2d 1287 (3d Cir.1979); *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F.Supp. 1291 (D.Del.1970).

This Court's discussion of different scenarios based on a multitude of hypotheticals presuming: (a) different composition of the State's ownership and control of some of Defendants, as well as (b) different Chinese regulatory regimes, appears to be wholly unwarranted at the instant juncture: it would produce nothing but a treatise-long *dictum*. The Court, therefore, presumes—*for the purposes of this discussion only*—that all Defendants named in this matter are entities enjoying such juridical status and/or operational regime that Plaintiffs' allegations stated in the Complaint *cannot* be qualified as implicating either the act-of-state or foreign sovereign compulsion, or comity doctrines,

or the Foreign Sovereign Immunities Act ("FSIA"), Pub.L. No. 94–583, 90 Stat. 2892, or as probing exceptions to the FSIA, or as bringing into this discussion any other provision, judicially-create doctrine or public policy related to a foreign sovereign's action.[21]

### B. *As Drafted, Plaintiffs' Complaint Is Barred by the FTAIA*

█ As noted *supra*, Plaintiffs named seventeen Defendants, sixteen of which are described by such terms as "Chinese state-owned trading company," "Chinese directly owned state company," "Chinese trading company" and "Chinese corporation." *See* Compl. at 2–5. The seventeenth Defendant, Minmetals, is defined as "a New Jersey corporation [which is] a subsidiary and affiliate of [the Defendant that is a Chinese state-owned trading company]." *Id.* at 3.

The Complaint is void of any information as to whether any of these seventeen Defendants was *actually bringing* Processed Magnesite *into the United States.*[22] *See* Compl. ¶ 26 (merely notifying the Court that "[e]ach of these [D]efendants [either] directly [or] *through affiliates* . . . is engaged in the business of manufacturing and selling [Processed Magnesite] in the United States and *throughout the world*," hence allowing for a presumption that none of Defendants actually imported

---

**21.** The Court notes, in passing, that Plaintiffs' claims are based on Defendants' activities that started, allegedly, around April of 2000 and continued, at least, to the date of Plaintiffs' filing of the Complaint, *i.e.*, until September 7, 2005 ("Complained Period"). *See* Compl. ¶¶ 45, 62. However, since Chinese privatization processes started in 1978 and, according to *Public Perspectives* at 32, kept at least one-third of Chinese industry owned by the State, it is entirely plausible that all (or some) of the seventeen Defendants were State-owned enterprises at the beginning of the Complained Period but changed their ju-

ridical status and became non-State-owned entities by the end of the Complained Period and—in addition—might have experienced intermittent regulatory and non-regulatory sub-periods since they became privately owned.

**22.** Indeed, the Complaint does not assert that Minmetals, an alleged arm of its parent Defendant, operated as an importer of any Chinese goods, or as an importer of Chinese Processed Magnesite in particular. *See* Compl. at 3.

Processed Magnesite into the United States).

Moreover, the Complaint is infused with statements unambiguously indicating that Defendants' allegedly illegal combination activities: (a) took place primarily in China or at unknown destinations which appear to be locales other than the United States, *see* Compl. ¶ 51 (asserting that Defendants "participated in meetings and conversations *in China and elsewhere*"); and (b) targeted and affected Defendants' entire world trade in Processed Magnesite rather than aiming primarily at the United States market. *See id.* ¶¶ 1, 26, 45–51, 53. Therefore, Plaintiffs' allegations must necessarily be construed as inviting the FTAIA scrutiny. *See Dee–K Enters.*, 299 F.3d at 294; *accord Turicentro*, 303 F.3d at 302.

### 1. Trade and Commerce

At the outset of its FTAIA analysis, the Court shall establish whether Plaintiffs' allegations indicate that Defendants' alleged conduct "involv[ed] trade or commerce ... with foreign nation." *See* 15 U.S.C. § 6a; *Turicentro*, 303 F.3d at 302. The inquiry, while usually simple, does not present an easy task in the case at hand, since the allegations made by Plaintiffs discuss mainly Defendants' alleged "combination and conspiring" activities, *see*

Compl. at 9–11 (enlightening the Court that "Defendants began their ongoing combination and conspiracy to suppress competition by fixing the price and controlling export sale volumes of [Processed Magnesite] offered for sale ... in the United States and elsewhere"). These generic references to "conspiracy" and "fixing prices" do not establish that any Defendant was actually involved trade or commerce with foreign nation, since Defendants could merely be producers of Processed Magnesium, producers of any other metals or minerals, sellers of Processed Magnesite in their own domestic market, or even equity holders, advisory entities, etc.[23]

However, being mindful of the Court of Appeals observation that a defendant might be presumed to be involved in import trade or commerce, if the defendant elects to refer to itself as an "importer," *see Carpet Group*, 227 F.3d at 72, the Court takes notice of the fact that the names of seven Defendants out of the seventeen named in the Complaint (*i.e.*, China National Metals & Minerals Import & Export Co., China National Minerals Import & Export Corporation, China Metallurgical Import & Export Co., Haicheng Huayu Group Import & Export Co. Ltd., Xiyang Import & Export Ltd. Co., Liaoning Foreign Trade General Co. and Dalian

---

**23.** For the time being, the Court will not consider Plaintiffs' allegation that Defendants were "controlling export sale volumes of [Processed Magnesite] offered for sale ... in the United States and elsewhere," since the export quotas of Processed Magnesite were typically established by the Chinese government through a licensing mode, where licences are purchased by Chinese entities with respect to the particular goods the entity desires to export. *See, e.g.*, Government Surveys–Citations. Therefore, any challenge to the Chinese government's decisions as to exportation quotas clearly implicates provision, judicially-create doctrine or public policy related to a foreign sovereign's action. Moreover, the fact that China became a member of the WTO in 2001 affected Chinese licencing policies, and any allegations as to the illegality of Chinese export quotas qualify as claims of China's violations of its WTO obligations: such allegations are not properly before this Court and should be entertained pursuant to the WTO dispute resolution mode incorporated into the treaty. That said, Plaintiffs are indeed free to state in an amended complaint any allegations against Defendants based on Defendants' agreements to control the volume of Processed Magnesite exportation *on the bases other than those ensuing from the governmental licensing scheme.*

Golden Sun Import & Export Co.) include such terms as "import," "export" and "foreign trade," *see* Compl. at 2–3, hence inviting the conclusion that at least these seven Defendants were actually involved in exportation from China to some foreign markets. *Accord* Compl. ¶ 26 (similarly suggesting such possibility by asserting that "[D]efendants [either] directly [or] through affiliates [were] engaged in the business of manufacturing and selling [Processed Magnesite] throughout the world"). The Court, therefore, deems this prong of the FTAIA satisfied for the purposes of the instant analysis.

## 2. Plaintiffs Failed to Assert Facts Showing a Link Between Defendants' Alleged Illegal Actions and the United States Commerce

To avoid the FTAIA bar, the plaintiff must show a clear link between the aim of Defendants' alleged *illegal* activities and *the United States market. See Dee–K Enters.*, 299 F.3d at 295–96. Here, Plaintiffs' three allegations, apparently made with an express aim to assert such a link, read as follows: (1) "[Defendants'] horizontal prices were designed to, and in fact did, have a substantial and adverse impact in the United States"; (2) "the conduct of [D]efendants . . . affected the interstate and foreign trade and commerce in the United States"; and (3) "[t]he conduct of [D]efendants . . . has directly, substantially and foreseeably restrained such trade and commerce." Compl. ¶¶ 27; 43–44.

These conclusive allegations, however, are facially insufficient in light of the Supreme Court's teaching that the plaintiff can meet the plaintiff's pleading burden only if the complaint contains "enough [factual] heft" rather than "labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Twombly*, 127 S.Ct. at 1965–69. The Court, thus, dispenses with these bold conclusions without further review.[24]

In addition to these three conclusory statements, Plaintiffs make seven other allegations which might be interpreted as Plaintiffs' attempt to assert a link between Defendants' allegedly illegal activities and the United States market. These seven allegations read as follows: (1) "Defendant producers have lower costs than their western competitors"; (2) "[e]xporters from China . . . enjoy a competitive advantage . . . because China . . . undervalues the Yuan, making Chinese export [goods] relatively less expensive compared to exports . . . from other nations"; (3) "[d]uring the conspiracy, prices of [Processed Magnesite] have not followed the laws of supply and demand that exist in a competitive market. Prices have remained stable or increased during the [Relevant Period] despite low demand"; (4) "[d]ue to [D]efendants' price fixing and market allocation activity, the prices of [Processed Magnesite] have increased despite reduction in the cost of production";[25] (5) "as the cartel

24. The Court notes, in passing, that—while not substituting for Plaintiffs' facts—Plaintiffs' statements that Defendants' actions had a "substantial and adverse impact" and that Defendants "substantially and foreseeabl[y] restrain[ed]" U.S. commerce appear indicative of Plaintiffs' awareness that the case at hand is governed by the FTAIA, since: (a) the "direct, substantial and reasonably foreseeable effect" test is never implicated by the Sherman Act, *see Carpet Group*, 227 F.3d at 72 (citing 54 Am. Jur. 2d § 18, at 77); and (b)

even the less rigorous analysis of effects that the restraint allegedly had on the competition should be wholly inapplicable to Plaintiffs' claim based on the "violation *per se*" theory, *see* Compl. ¶ 1, since any "effects" analysis is relevant only to the "rule of reason" claims. *See Pace Elecs., Inc.*, 213 F.3d at 123 (if a restraint is *per se* illegal, further examination of the practice's impact on the market is unnecessary).

25. Since, short of this single reference to "market allocation activity," *see* Compl. ¶ 57,

has taken steps to restrain production and increase prices, competitors [around the world] have shown that they would follow price increases rather than undercut the new cartel price levels"; (6) "[i]n 2004, the collusive agreements of the cartel continued to maintain prices well above those of a competitive market"; and (7) "[p]rices of magnesite in the animal feed industry . . . have steadily grown . . . and risen an overall 25 percent during [the Relevant Period]." Compl. ¶¶ 42; 53–54; 56–57. However, none of these allegations suggests a link between Defendants' *illegal* activities and the United States market.

### a. Cost–of–Production Arguments

Three of the above-quoted seven statements appear to reflect Plaintiffs' view as to how the United States market should have benefitted—but did not benefit—from Defendants' allegedly low costs of production.[26] The first of these statements invites the Court to deduce that Defendants illegal activities must be linked to the United States trade and commerce because "Defendant producers have lower costs than their western competitors." Compl. ¶ 42.

However if an entity is conducting its business in a developing country, the fact that the entity's costs might be lower than those of analogous enterprises doing business in developed nations is neither indicative of the entity's anticompetitive practices nor suggests that the entity's goal is to affect the trade in a certain consumer nation. To illustrate, coffee-shop "A" selling a cup of cappuccino for $2.00 while incurring 50 cents of total fixed and variable costs per cup cannot be accused of anticompetitive practices simply because it elects not to sell its cup of coffee at a price between $0.51 and $1.99, even if: (a) all neighboring stores, except for a certain other coffee-shop "B," incur total costs per cup of $0.51 or higher and sell their cappuccino for $2.10 or above; and (b) coffee-shop "B" has both costs and sale prices identical to those of the "A" coffee-shop. Had it been otherwise, any entity operating above its break-even level would necessarily be suspect of anticompetitive practices.

The fact that an entity does not elect to sell its goods or services "even cheaper" suggests neither the entity's illegal activities nor a link between these illegal activities and the United States market.[27] Since Plaintiffs' facts equally allow for a conclusion that Defendants' prices were a result of Defendants' legitimate assessment of the world's markets, Plaintiffs' allegations based on a stereotypical observation that expenses born by western producers are usually higher than those of Chinese coun-

---

the Complaint is entirely silent as to any market allocation actions, the Court will not presume that Plaintiffs' single reference to "market allocation activity" was a result of a conscious desire to assert allocation of markets.

**26.** At the outset, it shall be noted that activities of a foreign *producer* fall outside the reach of the Sherman Act since a "producer" is neither an "importer" into the United States nor an entity engaged in "trade or commerce" for the purposes of the FTAIA (*i.e.*, not an importer into markets other than the United States). *See Carpet Group*, 227 F.3d at 72. In light of Plaintiffs' systemic conflation of the terms "producer" and "importer," the Court presumes that Plaintiff intended to assert that every Defendant was a producer, as well as an importer, of Processed Magnesite.

**27.** Here, Plaintiffs appear to concede that Chinese imports of Processed Magnesite were the cheapest (or among the cheapest) available at the market, be it the United States market or world market, and be it in comparison with the products of developed or developing nations. *See* Compl. ¶ 53 ("Chinese producers . . . set a floor below which other producers cannot compete).

terparts cannot be qualified as a fact linking Defendants' allegedly illegal actions to the United States trade and commerce. *See Twombly*, 127 S.Ct. at 1966 n. 5 (the line "between the factually neutral and the factually suggestive ... must be crossed").

Next, Plaintiffs attempt to show a link between Defendants' allegedly illegal conduct and the United States trade and commerce by stating that "the prices of [Processed Magnesite] have increased [during the Relevant Period] despite reduction in the cost of production," presumably, in China. Compl. ¶ 57. This statement is similarly flawed on many levels.

The Court is unaware of any economic theory—and Plaintiffs enlighten the Court about none—upon which an entity, whose profit margin increased due to a reduction in costs of production, would have an incentive to forfeit that profit margin by passing the saving to the consumer or to forfeit an opportunity to raise its prices (and, hence, net profit) if the market so allows. The only economic concept vaguely resembling Plaintiffs' assertion is that a business entity, whose operational costs are marginally reduced, *might* consider lowering its prices in an attempt to gain a larger market share. However, even this concept in no way produces a mandatory rule, since a business considering to seek a larger market share makes its decision in light of a multitude of economic considerations, such as the principle of increased opportunity cost and/or the speed and likelihood of obtaining return of and profit on its capital investment.[28]

Moreover, even if there were an economic theory supporting Plaintiffs' position, Plaintiffs' conclusions would necessarily be true only if Defendants, in fact, enjoyed a "reduction in the cost of production" during the Relevant Period. However, the Complaint is void of facts so suggesting, and the Court's own information indicates to the contrary. For instance,

**28.** The principle of increased opportunity cost (also known as the principle of diminishing marginal returns) provides that, in a production system operating with both fixed and variable factors of production, there invariably comes a point when each additional unit of variable input yields less output per each input unit. *See* Robert S. Pindyck, Daniel L. Rubinfeld, *Microeconomics* 194–97, 218–19 (6th ed. 2005). E.g., a pizza store having an oven capable of baking, at maximum 1,000 pizzas per day cannot bake 1,001st pizza even if the owner keeps hiring employees capable of preparing more that 1,000 pies per day: all that owner would incur with these new hires is less pizzas per employee, *i.e.*, his profit would decrease because the output would remain the same but the overhead would keep increasing. A business entity *might invest in* fixed asset (also known as property, plant and equipment, or "PPE") to remedy the above scenario e.g., buy an *additional pizza oven to* allow the additional employees produce more pizzas. *See, e.g.*, Charles T. Horngren, et al., *Introduction to Financial Accounting* 336–49 (9th ed. 2005). However, since PPE cannot easily be converted into cash (plus, equipment and plant are also subject to depreciation), a fixed asset investment might recoup itself only in the long run or, in the event of an unfavorable economic turn (e.g., a decline of pizza-consumption) or regulatory change (e.g., an ordinance prohibiting two ovens in one pizzeria as in violation of the local fire code), might even result in capital loss. Therefore, in industries where PPE investment is necessarily substantial (such as in mining and processing of minerals industries), the considerations related to long-term investment recoupment and uncertainties about the legal and economic regime often outweigh the discounted-to-their-current-value potential future profits. Here, the Complaint indicates that production of Processed Magnesite requires extensive labor and substantial investments in plant and equipment. *See* Compl. ¶¶ 38–41; *see also* <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/mgcmyb2001.pdf>> (discussing a Chinese–Japanese joint venture launched in 2001 aiming to build a plant producing Processed Magnesite in Liaoning Province, China, at the construction cost of $3.65 million).

United States official data shows that: (a) the cost of energy and freight in China increased notably during the Relevant Period, *see* <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/mgcommyb03.pdf>>; <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/ mgcommyb04.pdf>>; *see also* <<http://www.stats.gov.cn/tjsj/ndsj/2005/html/I0913E.HTM>> (showing 9% increase in costs of fuel and power between 1999 to 2004); and (b) the cost of labor in Chinese mining and mining-related industries more than doubled from 2000 to 2005.[29] *See* <<http://www.stats.gov.cn/tjsj/ndsj/2006/html/E0520E.HTM>>; <<http://www.stats.gov.cn/english/statisticaldata/yearlydata/yb2004-e/html/E 0526ae.htm>>; <<http://www.stats.gov.cn/english/statisticaldata/yearlydata/YB 2002e/html/e0526ae.htm>>; <<http://www.stats.gov.cn/english/statisticaldata/yearlydata/YB2001e/html/e0526ae.htm>> (information provided by the National Bureau of Statistics of China, indicating that the wages of employees in state-owned facilities increased, between 1999 and 2005, from 8,283 yuan to 20,992 yuan per annum, that is 254%; while the wages in collectively-owned units increased from 4,857 to 11,268 (231%), and in all other units went from 9,842 to 21,207, that is, 215%). Therefore, Plaintiffs' bold assertions appear to be contrary to the known economic theories and based on nothing but Plaintiffs' factless conjecture.

Plaintiffs' third statement seemingly related to Defendants' costs of production asserts that, "[i]n 2004, the collusive agreements of the cartel continued to maintain prices well above those of a competitive market." Compl. ¶ 54. This allegation warrants little discussion, since it merely expresses Plaintiffs' belief that competitive market prices in the United States should necessarily have been lower during the Relevant Period, without any explanation as to Plaintiffs' bases for such a bold conclusion. *See Twombly*, 127 S.Ct. at 1965–69 (the complaint cannot be based on self-serving interpretations of actual events, or mere labels and conclusions).

### b. Currency- and Sale–Price–Based Arguments

Next, Plaintiffs try to show a link between Defendants' allegedly illegal activities and the United States trade and commerce by asserting that "[e]xporters from China ... enjoy a competitive advantage ... because China ... undervalues the Yuan, making Chinese export[ed goods] relatively less expensive compared to exports from other nations." Compl. ¶ 42. Plaintiffs argue against their own position.

The renminbi, Chinese mainland national currency, is issued by the People's Bank of China and measured in units referred to as "yuan." *See Currency Trading*, Wall St. J. C18 (Nov. 8, 1996); Larry L. Drumm, *Changing Money: Foreign Exchange Reform in the People's Republic of China*, 18 Hastings Int'l & Comp. L. Rev. 359, 384–386 (Winter 1995). Initially pegged to the U.S. dollar at 2.46 yuan per dollar, renminbi kept declining in its pegged exchange rate until 1994 and then kept rising (while still being pegged) until 2005, when the peg was lifted causing revaluation from 8.27 to 8.11 yuan per dollar. *See* <<http://www.pbc.gov.cn/english //detail.asp?col=6400 & IDcol=6400 & ID=542>>. Had the renminbi not been pegged to U.S. dollar, Chinese goods would cost American consumers more, *i.e.*, they would be closer, price-wise, to comparable goods from the countries which did

---

**29.** The discussion of CCM, DRB and EFM production provided in the Complaint suggests production of Processed Magnesite is a labor-intensive process. *See* Compl. ¶¶ 38–41.

not undervalue their currencies.[30] It follows that, had Defendants been taking an illegal advantage of the undervalued renminbi, they should have fixed their prices just a tad below those of all other importers. However, the market data available suggests none of such price fixing tendencies.

The Government Surveys indicate that, during the Relevant Period, China and Canada were the largest United States importers with respect to CCM, while China, Australia and Austria were the largest United States importers with respect to DBM and EFM.[31] *See* Government Surveys—Citations. Detailing the prices charged by these importers, the Surveys show that: (a) in CCM market, Chinese prices were *substantially* below Canadian ones (i.e., $106 per metric ton versus $177 per metric ton in 1999; $112 versus $174 in 2000; $119 versus $188 in 2001; $111 versus $179 in 2002; $103 versus $171 in 2003; $117 versus $167 in 2004; and $142 versus $180 in 2005); just as (b) in DBM and EFM markets, Chinese prices were *substantially* below Australian and Austrian prices (i.e., $126 per metric ton versus $262 per metric ton in 1999; $129 versus $224 in 2000; $148 versus $197 in 2001; $141 versus $204 in 2002; $160 versus $236 in 2003; $208 versus $527 in 2004; and $212 versus $507 in 2005). *See id.*

Granted the foregoing, it appears that Plaintiffs' currency-based argument is nothing but another expression of Plaintiffs' disappointment with the fact that the world prices on Chinese Processed Magnesite were not lower than what they actually were. However, Plaintiffs' disappointment (or Plaintiffs' belief that Defendants should have made less profit by selling their Processed Magnesium even cheaper), can neither translate into a fact suggesting that Defendants' activities were anti-competitive nor link the United States trade and commerce to any illegal activities. *See Twombly,* 127 S.Ct. at 1965–69 (the complaint cannot be based on self-serving conclusions). Plaintiffs' following allegation, i.e., that, "as the cartel has taken steps to restrain production and increase prices, competitors [around the world] have shown that they would follow price increases rather than undercut the new cartel price levels," Compl. ¶ 53, appears not only factually unsubstantiated (since the Court is left to speculate about the prices and pricing rationale of all Processed Magnesite importers in the world) but also facially insufficient to either suggest Defendants' illegal activities or to link these activities to the United States market: the fact of parallel pricing does not satisfy the pleading requirements even with respect

**30.** The peg was widely discussed in American academic and periodic literature since, when U.S. dollar was depreciating against other major currencies (which was rendering U.S. exports more competitive), the fact that the renminbi was pegged to the dollar automatically caused the value of renminbi to go down in foreign markets, hence minimizing the advantage U.S. products were gaining in world markets. *See* Wayne M. Morrison & Marc Labonte, *CRS Report for Congress, China's Currency Peg: A Summary of the Economic Issues,* at 4 (2005). Moreover, because of the peg, Chinese goods entered the United States market at significantly lower prices than other imports (making Chinese goods attractive to American consumers), while American

goods were entering China's domestic markets at much higher costs (rendering these goods less attractive to Chinese consumers), thus increasing United States trade deficit. *See id.*

**31.** While Australia was the second leading, that is, volume-wise, United States importer of DBM and EFC during 1999–2003, Austria surpassed Australia and became the second leading importer of DBM and EFM in 2004 and 2005. China remained the largest importer of CCM, DBM and EFC through the entire Relevant Period. *See* Government Surveys—Citations.

to the farless-demanding standard posed by the Sherman Act. *See Twombly*, 127 S.Ct. at 1964.

### c. Economic Arguments

According to the Complaint, "[d]uring the conspiracy, prices of [Processed Magnesite] have not followed the laws of supply and demand that exist in a competitive market. Prices have remained stable or increased during the [Relevant Period] despite low demand." Compl. ¶ 56. The argument suggests Plaintiffs' misunderstanding of the economic concepts they invoke.

The "supply and demand" economic model describes the operations of market mechanism. It is graphically represented through two curved functions which, if read jointly, reflect the understanding that, in a competitive market, price will function to equalize supply and demand. *See, e.g.*, Robert S. Pindyck, Daniel L. Rubinfeld, *Microeconomics* 20–24 (6th ed. 2005). The model neither requires all producers to sell comparable goods at the same price nor implies that a decline in demand would force *all* producers to lower their prices: the leeway available to sellers depends on price elasticity of their goods. *See id.* at 24–53 (discussing the concept of price elasticity, as well as related concept of supply/demand elasticity). Thus, if demand for certain goods begins to decline, the sellers offering their goods at the upper-bracket prices would be forced to lower them (or go out of business if competitive prices become so low to render their businesses unprofitable), while the sellers offering their goods at lower-bracket prices do not have to change their pricing policies—and may even legitimately increase their prices—until the demand drops to such a point that there is not enough market even for the goods they sell.[32] *See id.* at 32–53, 265–89 (discussing the relationship between elasticities, marginal revenue, short-run and log-run supplies). Hence, Plaintiffs' argument that the gradual increase in the prices of Processed Magnesite imported from China during the Relevant Period was in contradiction to the rules of supply and demand is based on an incorrect reading of economic theories. Moreover, Plaintiffs' assertion that the Processed Magnesite market suffered a *systemic* decline during the entire Relevant Period appears erroneous, since the decline occurred only in 2001, duly causing a substantial decline in importation from China. *See* <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/401400.pdf>> ("[Only in 2001, a] general economic downturn led to decreasing demand ... and as a result, production and imports declined by 20% ... from the 2000 levels ..., with the imports from China ... declining by more than 100,000 metric tons"). This decline of 2001 followed the spike in importation that took place in 2000, *see* <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/mgcmyb2001.pdf>> (explaining that "the reasons for the significant increase in imports was to replace ... the domestically produced material ... lost when [NRMC] closed"), and

---

**32.** To illustrate, if tomato growers who previously sold their crop for $1.00 to $2.00 per pound are faced with a market decline, the growers who were selling at $2.00 per pound would have to lower their prices in order to compete for the shrunk market (or to leave the business if they cannot afford reduction in price), while the growers who were selling at $1.00 per pound would still be in the position to keep increasing their prices until the decline in demand becomes such that even these growers cannot sell their entire crop (at which point, these growers would have to either compete with each other by lowering their sale prices or reduce their production).

preceded a systemic rebound that took place after 2001. *See* Government Survey–Citations.

In the same vein, Plaintiffs' final observation, *i.e.,* that [p]rices of magnesite in the animal feed industry ... have steadily grown ... and risen an overall 25 percent during [the Relevant Period]," Compl. ¶ 54, does not suggest a link between Defendants' alleged illegal activities and the United States trade and commerce, since the increase in supply prices in animal feed industry could have occurred for an infinite number of reasons, either entirely unrelated to Defendants' importation practices or related to Defendants' legitimate activities, or a combination of both.[33]

### 3. *The Complaint Indicates Lack of Subject Matter Jurisdiction*

As the foregoing discussion illustrates, Plaintiffs' allegations fail to state any facts linking Defendants' alleged illegal activities and the United States trade and commerce: all that Plaintiffs assert is that world Processed Magnesite prices (as well as Chinese Processed Magnesite prices) were rising during the Relevant Period. *See generally* Compl. However, such allegations cannot remove the FTAIA bar. *Compare Carpet Group,* 227 F.3d at 73. In *Carpet Group,* being presented with allegations (and extensive documentary evidence) indicating that defendants' specifically threatened to cease dealing with and expel from their trade associations those manufacturers/retailers that participated in the plaintiffs' *United States* trade shows and/or traded with *United States* plaintiffs,

the Court of Appeals stressed that the FTAIA bar is inapplicable if:

> [t]he crux of [the] case involves conduct in the United States, not conduct abroad [because such] activities are not the type of conduct Congress intended to remove from our antitrust jurisdiction when it enacted the FTAIA.

*Id.* at 73. Here, in contrast, the case involves predominantly foreign conduct, *i.e.,* Defendants' world-wide trade practices, which no statement made in the Complaint (short of Plaintiffs' self-serving conclusions), renders anticompetitive. Rather, the circumstances at hand are similar to those examined in *Dee–K Enterprises* in the sense that the alleged defendants' business activity was world-wide, without any focus on the United States (although, unlike here, the plaintiffs in *Dee–K Enterprises* actually alleged and proved specific facts showing that the defendants' business operations stemmed from an illegal conspiracy). *See Dee–K Enters.,* 299 F.3d 281. The Court of Appeals for the Fourth Circuit, while acknowledging the conspiracy aspect, still found that liability was barred by the FTAIA because the target of defendants' operations "was a global market, [and the] links to the United States are mere drops in the sea of conduct that occurred ... around the world." *Dee–K Enters.,* 299 F.3d at 295–96. *A fortiori,* the allegations at hand, containing no facts suggesting an illegal conspiracy and asserting nothing more than Defendants' world-wide business operations, a small fraction of which implicated the United States market,[34] are barred by the

---

**33.** Since the prices on Chinese-produced CCM imported into the United States increased from $106 per metric ton in 1999 to $142 per metric ton in 2005 (that is, by 34%), while the prices on Chinese-produced DBM and EFM imported into the United States increased from $126 in 1999 to $212 in 2005 (that is, by 68%), the 25% increase in prices of magnesite in the United States animal feed

industry does not appear to correspond to the changes in prices charged by importers of Chinese Processed Magnesite.

**34.** As noted *supra,* the amount of Processed Magnesite exported from China to the United States ranged from 11% to 26% of Chinese production: 21% in 1999; 26% in 2000; 13%

FTAIA: stripped of all niceties, Plaintiffs' assertion is nothing but a circular argument first stating that Defendants' Processed Magnesite prices kept rising during the Relevant Period (along with the world's Processed Magnesite prices), then deducing from that fact that the price rise must be attributed to a conspiracy, and then following that conclusion with a deducement that the rising prices must have had a direct and substantial effect on the United States market *simply because the prices were rising all over the world,* United States included. *See generally,* Compl. However, the "direct, substantial and reasonably foreseeable effect" element of the FTAIA cannot be pled by a mere expression of Plaintiffs' disappointment with the world's pricing tendencies. In light of the foregoing, the Court will dismiss the Complaint for lack of subject matter jurisdiction, pursuant to 15 U.S.C. § 6a.

### C. As Drafted, Plaintiffs' Complaint Fails to State a Sherman Act Claim

■ Even if the Court were to ignore the deficiencies of the Complaint related to the FTAIA, the Complaint should be dismissed for failure to state a claim under the Sherman Act.

As noted *supra,* "[t]o establish a violation of Section 1, a plaintiff must prove, [*inter alia* ]: (1)[a] concerted action by the defendants; [and (2) ] that the concerted action [was] illegal." *Gordon,* 423 F.3d at 207. Here, Plaintiffs' statements related to Defendants' alleged combination and conspiracy consists of the following assertions: (a) in April of 2000, thirteen unidentified Chinese producers and exporters of magnesite reached a price-fixing agreement and established a certain cartel; (b) about the same time, the second cartel consisting of unspecified number of un-

identified members reached their own price-fixing agreement; (c) shortly thereafter, the two cartels formed a unified cartel, which conducted an unspecified number of meetings in China and "elsewhere," one of which took place on March 22, 2003, in Shenyang, China, gathering nineteen cartel members that included an unspecified number of unidentified Defendants; and (d) during this meeting, the cartel renamed itself, reiterated its goal of maintaining and increasing Processed Magnesite prices, and successfully stabilized the prices from that point on. *See* Compl. ¶¶ 44–54. The foregoing is further detailed only by the names of the two original cartels, the name of the unified cartel, and the name the unified cartel assumed upon self-renaming. *See id.* Plaintiffs justify such paucity of information by noting that they did not and could not discover more information because Defendants "intentionally, and *fraudulently* concealed the existence of the combination and conspiracy" by having secret meetings, enforcing the secrecy through threats and "[i]ntentionally setting prices purportedly on a competitive basis." *Id.* ¶ 59 (the Section titled "Fraudulent Concealment") (emphasis supplied).

Defendants argue that the Complaint, having the Section titled "Fraudulent Concealment" and the language asserting that Defendants "intentionally, and *fraudulently* concealed the existence of the combination and conspiracy," *see id.,* should be read as alleging "that [D]efendants carried out their antitrust conspiracy through fraud" and, hence, scrutinized pursuant to Rule 9(b). *See* Docket Entry No. 38, at 6–7 (citing *Lum v. Bank of America,* 361 F.3d 217, 228 (3d Cir.), *cert. denied,* 543 U.S. 918, 125 S.Ct. 271, 160 L.Ed.2d 203

in 2001; 11% in 2002 and 2003; and 12% in

2004 and 2005. *See* Government Surveys.

(2004)). The Court agrees.[35]

In *Lum*, plaintiffs-borrowers alleged that defendants-banks, in setting their "prime plus" interest rates, violated the Sherman Act by agreeing to misrepresent that these "prime rates" were the lowest available. *See Lum*, 361 F.3d at 220. The Court of Appeals found that the borrowers' claim was insufficiently pled to meet the steep Rule 9(b) requirement. *See id.* at 228. The *Lum* court expressly pointed out that, in order to bring a pleading within the realm of Rule 9(b), it is sufficient for the complaint to utilize the term "fraud" or "fraudulent" just in one paragraph. *See id.* (noting that the complaint was deemed to alleged that the banks "accomplished the goal of their conspiracy through fraud" because one paragraph in the complaint asserted that the banks "entered into a ... conspiracy ... designed to fraudulently and artificially inflate the 'prime rate' [and,] as a result of this ... conspiracy ..., the 'prime rate' ... remained artificially high").

Here, Plaintiffs' allegations that Defendants "fraudulently concealed the existence of ... conspiracy [while] intentionally setting prices purportedly on a competitive basis [and causing Processed Magnesite prices to be] stabilized at artificial and non-competitive levels," *id.* ¶ 59–60, practically mimic those examined by the Third Circuit in *Lum*. The Court, therefore, finds the application of Rule 9(b) appropriate to Plaintiffs' pleading.

Pursuant to Rule 9(b), a plaintiff averring a claim in fraud must specify " 'the who, what, when, where, and how: the first paragraph of any newspaper story.' " *Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir.1999) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990)). "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting *precision and some measure of substantiation* into their allegations of fraud.' " *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 216 (3d Cir.2002) (quoting *In re Nice Sys., Ltd. Secs. Litig.*, 135 F.Supp.2d 551, 577 (D.N.J.2001), emphasis supplied). Here, in contrast, Plaintiffs' allegations are exceedingly vague: short of stating the names and renaming of alleged cartels, Plaintiffs' precision of pleading is limited to the date of a single meeting and a claim that one of the original cartels consisted of thirteen unidentified members. *See* Compl. ¶¶ 44–54. Defendants and the Court are left to guess whether any of the named Defendants was a member of either the original or unified-and-later-renamed

---

**35.** Application of the strict requirements of Rule 9 to cases involving allegations of fraud has been uniformly recognized and invariably administered by all courts. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Karvelas v. Melrose–Wakefield Hosp.*, 360 F.3d 220, 226 (1st Cir.2004); *First Capital Asset Mgt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178–179 (2nd Cir.2004); *Lum*, 361 F.3d at 223–224; *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783–784 (4th Cir.1999); *Tel–Phonic Services, Inc. v. TBS Intern., Inc.*, 975 F.2d 1134, 1138–1139 (5th Cir.1992); *Advocacy Organization for Patients and Providers v. Auto Club Ins. Assn.*, 176 F.3d 315, 322 (6th Cir. 1999); *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 468–470 (7th Cir. 1999); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549–550 (8th Cir.1997); *Lancaster Comm. Hospital v. Antelope Valley Hospital Distr.*, 940 F.2d 397, 405 (9th Cir.1991); *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1362 (10th Cir.1989); *Brooks v. Blue Cross & Blue Shield of Florida*, 116 F.3d 1364,1380–1381 (11th Cir.1997); *Danielsen v. Burnside–Ott Aviation Training Center, Inc.*, 941 F.2d 1220, 1229 (D.C.Cir. 1991).

cartel or attended any of the alleged meetings, the locations "in China and elsewhere," where the alleged meetings took place, and/or the terms of the agreements reached and whether any of the named Defendants actually accepted and/or adhered to these agreements.[36] *See id.*; *see also, Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (a would-be member of a conspiracy comes within the Sherman Act when it *actually engages* in "anticompetitive conduct" by attaining, at the very least, dangerous probability of success in a relevant market). The vagueness of the allegations at hand is such that they fail to meet even the lenient Rule 8 pleading requirement. *See Twombly,* 127 S.Ct. at 1969–74 (explaining that even a "plain statement" must contain "enough facts to state a claim to relief that is plausible on its face"); *accord Dura,* 125 S.Ct. at 1633–34 ("it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of [facts stating the elements of the claim] that the plaintiff has in mind").

Moreover, the Court is left unpersuaded by Plaintiffs' claim they "did not discover and could not discover" facts about the alleged anticompetitive conduct because of the alleged cartels' extreme secrecy (and severe enforcement of that the secrecy). *See* Compl. ¶ 59. For instance, the Government Surveys, *documents publically available on a government website since 1996, i.e.,* since the time long predating the

events alleged in the Complaint, indicate that:

(a) "In February [of 2001], the China Magnesite Export Association ("CMEA") was formed, uniting the two separate export syndicates that were formed in 2000.... The stated goals of the CMEA [was] to stabilize magnesia export prices and ensure supply of quality products." (The Survey published in 2001).

(b) "In February [of 2003], a new Chinese magnesia export association was formed [to] control[ ] about 70% of the [China's] magnesite export license[e]s.... This new association represents the *fourth time* that China's major magnesite producers have attempted to form an association that would stabilize the country's magnesite supply by setting floor prices." (The Survey published in 2003).

(c) "In February [of 2004], another magnesite export syndicate was formed in China—the China Magnesite Self–Disciplined Association. This is the *fifth version* of a group [trying] to regulate magnesite exports and prices since 2000. The new group represents five of the leading Chinese magnesite producers, and its goal was to maintain [DBM] prices." (The Survey published in 2004).

(d) "The Chinese magnesite export syndicate that was formed in February

**36.** Notably, Plaintiffs assert that the alleged meetings of conspirators were "coordinated," presumably, time- and location-wise, with legitimate "trade association meetings for associations in which [D]efendants [were] members." Compl. ¶ 51. Plaintiffs' assertion suggests that even if Plaintiffs offered the Court facts indicating the presence of Defendants' representatives at locations where the alleged cartel meetings took place during the time of these alleged cartel meetings, these facts would still be insufficient to allege Defendants' participation in an illegal conspiracy, since this presence might equally be attributed to Defendants' attendance of their legitimate trade association meetings. *See Twombly,* 127 S.Ct. at 1966 n. 5 (the line "between the factually neutral and the factually suggestive ... must be crossed").

2004 *fell apart* [in 2005] less than 1 year after its formation[: it] was the fifth in a series of associations [attempting] to control pricing ... of magnesite." (2005 Survey). Government Surveys—Citations (emphasis supplied). The above-quoted information: (a) suggests a very little degree of secrecy, if any; and (b) prompts a conclusion that well-publicized efforts to create a Chinese magnesite syndicate either yielded in a number of short-lived and independent— for the purposes of antitrust law—combinations (which may or may have not included any Defendant named in this action) or failed in toto due to the refusal of the invited members to accept/adhere to the proposed terms. *Accord Industrial Minerals: And Then There Was One: China's Latest Magnesia Export Group*, The Royal Society of Chemistry 7 (Chem. Bus. NewsBase: Indus. Minerals, Fin. Times Info., Apr. 24, 2001) (observing that Liaoning Jiayi Industrial Development Co., Ltd, an entity not named as a defendant in this action, was "spearheading" the 2001 efforts to form a "unified group [with] objectives [to obtain] price bargaining power as a group, [but] observers [were] skeptical as to the capability of the group's leaders to convince union members to forego potential individual profit for the sake of the union").

In light of availability of such information, as well as in light of the vagueness of Plaintiffs' allegations, the Court concludes that the Complaint fails to state a claim upon which relief can be granted even under the lenient Rule 8 requirement and, a *fortiori*, under the steep requirement of Rule 9(b). *Compare Lum*, 361 F.3d at 228 (quoting the Supreme Court's pre-*Twombly* observation, made in *Poller v. Columbia Broad. Sys.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), that leniency of pleading requirement might be warranted in "antitrust [cases when the] proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot").

### D. Plaintiffs' Motion for Default Judgment Will Be Denied

In light of the Court's finding that, as drafted, the Complaint fails to establish the Court's subject matter jurisdiction over this action and, in addition, fails to state a claim upon which relief can be granted, granting Plaintiffs' motion for default judgment would be wholly inappropriate. *See Comcast Cable Communs.*, 2005 U.S. Dist. LEXIS 23156, at *5–6; *Abney*, 334 F.Supp.2d 1221; *see also Comdyne I*, 908 F.2d at 1149; *Fehlhaber*, 425 F.2d at 717; *Bloom*, 896 F.Supp. at 170 n. 3. The Court, therefore, will deny Plaintiffs' Motion with prejudice.

## VIII. LEAVE TO AMEND

### A. Grant of Leave Is in the Interests of Justice

Having thoroughly examined Plaintiffs' Complaint, this Court now turns to the question of whether Plaintiffs shall be allowed to replead their claims.

Ordinarily, the plaintiff may be granted "leave [to amend,] ... when justice so requires." *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir.1993). That said, "[a]llowing leave to amend where there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced, which would, if true, cure the defects in the pleadings'" would frustrate the Court's ability to filter out lawsuits that have no factual basis. *Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 164 (3d Cir.2004) (internal quotation marks and citations omitted). Here, the vagueness of Plaintiffs'

pleadings causes the Court substantial concern.[37] However, at the instant juncture, the Court has no reason to conclude that the vague content of Plaintiffs' Complaint is necessarily indicative of Plaintiffs' lack of factual basis for their allegations.[38] The Court, therefore, finds it in the interests of justice to allow Plaintiffs an opportunity to re-plead their claims, and will grant them leave accordingly.

## B. *Future Litigation*

Thus far, the Court has been presented with a multitude of motions (in addition to those addressed in this Opinion). *See generally,* Docket. Since these motions, as well as peripheral challenge embedded in the Motions resolved by this discussion, raise a panoply of issues, the Court finds it prudent to provide the parties with a roadmap to the future litigation in the event: (a) Plaintiffs' elect to take advantage of the leave to file an amended complaint; and (b) Defendants elect to renew some or all of the challenges extended in Defendants' motions and/or scattered in Defendants' oppositions to Plaintiffs' Motion.

Hence, in the event Plaintiffs file an amended complaint, Plaintiffs *must* incorporate in their submission evidentiary proof allowing the Court to conduct a *factual determination* (in contrast with the facial analysis conducted herein) and to conclusively satisfy itself as to presence or lack of subject matter jurisdiction over this action. In the event Defendants wish to extend challenges to the Court's subject matter jurisdiction and/or to assert that the Court shall abstain from resolving the instant matter on the grounds involving any provision, judicially-create doctrine or public policy related to a foreign sovereign's action or to Chinese regulatory or legal regime, Defendants should do so at their *first opportunity* to respond to the amended complaint.

If, and only if, the Court: (a) determines that it *has* proper subject matter jurisdiction over this action; and (b) finds that it shall *not* abstain from resolving it, Defendants may, if they so desire, renew their currently extended challenges in the following order:

(1) Defendants shall first raise their challenges based on the alleged lack of personal jurisdiction, insufficient service of process and improper venue;

(2) only in the event Defendants elect not to raise such challenges, of if the Court determines that *in personam* jurisdiction was duly obtained and, in addition, establishes that the instant matter is properly before the Court, Defendants may, if they wish, re-raise their argument that the Court shall compel arbitration of this action; and

(3) if, and only if, Defendants elect not to raise such challenge or the Court denies Defendants' request to compel arbitration, Defendants may, if

---

**37.** The content of Plaintiffs' submissions made in opposition to various Defendants' motion or as reply to Defendants' opposition to Plaintiffs' motion causes the Court additional concern, since: (a) Defendants' submissions did raise, albeit without extensive discussion, the entire panoply of issues detailed or touched upon in the instant Opinion, such as the FTAIA, FSIA, abstention doctrines, the degree of precision required by Rule 8 and the particularity of requirement of Rule 9, etc., but (b) Plaintiffs' responsive submissions failed to state either Plaintiffs' facts or Plaintiffs' legal position as to any of these issues.

**38.** While the FTAIA and Rule 9(b) pleading standards were well established at the time of Plaintiffs' filing of their Complaint, the Court is mindful of the fact that the Complaint was drafted without the benefit of the Supreme Court's clarifications provided later in *Twombly*.

they so desire, renew their challenges asserting Plaintiffs' lack of standing and failure to state a claim upon which relief can be granted.[39]

 Plaintiffs, therefore, are strongly encouraged to draft their amended complaint with an eye on the challenges that had been raised and might be renewed by Defendants, while Defendants are encouraged to focus their efforts in accordance with the above-given roadmap.[40]

## IX. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for default judgment, Docket Entry No. 28, will be denied with prejudice. Defendant's Motion, Docket Entry No. 27, will be granted.

Plaintiffs' Complaint will be dismissed, as against all Defendants, for lack of subject matter jurisdiction or, in alternative, for failure to state a claim upon which relief can be granted. Such dismissal will be without prejudice, and Plaintiffs will be granted leave to amend their Complaint. Plaintiffs' motion for certification of Plaintiffs' putative class will be denied as premature. This matter will be administratively terminated, subject to reopening in the event Plaintiffs elect to file their amended pleadings.

All Defendants' motions other than Defendant's Motion, Docket Entry No. 27, will be dismissed, as moot, without prejudice to renewal of Defendants' challenges

in the event Plaintiffs file an amended complaint and this matter is reopened. Defendants' renewed challenges, if any, shall be presented in the sequence detailed herein.

An appropriate Order accompanies this Opinion.

---

39. The Court will not address certification of Plaintiffs' putative class until and unless the issues of subject matter and in *personam* jurisdictions, abstention, venue, arbitration, standing to sue, sufficiency of substantive pleadings, etc. are conclusively resolved in favor of Plaintiffs.

40. Plaintiffs and Defendants may contact other entities, such as United States or Chinese government agencies and/or trade associations interested in seeking *amici* status in order to present this Court with these entities'

positions as to the issues involved in this action. An entity "seeking to appear as *amicus* must ... make a showing that [its] participation is useful or otherwise desirable to the court." *Woodfin Suite Hotels, LLC v. City of Emeryville*, 2007 WL 81911, at *3, 2007 U.S. Dist. LEXIS 4467, at *7–8 (N.D.Cal. Jan. 8, 2007) (quoting *In re Roxford Foods Litigation*, 790 F.Supp. 987, 997 (E.D.Cal.1991), quoting, in turn, *United States v. Louisiana*, 751 F.Supp. 608, 620 (E.D.La.1990)).